<u>Exhibit A</u>

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 10-2741-BLS2

Cambridge Place Investment Management Inc. _____, Plaintiff(s)

v.

Morgan Stanley & Co., Inc., et al. _____, Defendant(s)

TO: Residential Funding Securities, LLC

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Bernstein Litowitz Berger & Grossmann LLP

plaintiff's attorney, whose address is 1285 Avenue of the Americas, 38th Fl., NY,NY 10019 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire, at Boston, the _fifteenth_ day of _July_, in the year of our Lord two thousand _ten_.

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER



FORM CIV.P. 1 3rd Rev. 10M - 8/09

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 10-2741-BLS2

Cambridge Place Investment Management Inc. ———— , Plaintiff(s)

v.

Morgan Stanley & Co., Inc., et al. ———— , Defendant(s)

TO: Residential Asset Mortgage Products, Inc.

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Bernstein Litowitz Berger & Grossmann LLP

plaintiff's attorney, whose address is 1285 Avenue of the Americas, 38th Fl., NY,NY 10019 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire, at Boston, the ___fifteenth___ day of ___July___ , in the year of our Lord two thousand ___ten___ .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev. 10M - 8/09

# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 10-2741-BLS2

Cambridge Place Investment Management Inc. _____, Plaintiff(s)

v.

Morgan Stanley & Co., Inc., et al. _____, Defendant(s)

TO: Residential Asset Securities Corporation

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Bernstein Litowitz Berger & Grossmann LLP

plaintiff's attorney, whose address is 1285 Avenue of the Americas, 38th Fl., NY,NY 10019 , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse, Esquire, at Boston, the _fifteenth_ day of July _____, in the year of our Lord two thousand _ten_.



Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. I 3rd Rev. 10M - 8/09

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _____, 20\_\_\_, I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:_____, 20 \_\_\_\_        _____

**N.B.   TO PROCESS SERVER: –**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN**
**THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| , 20 . |
|---|

**Commonwealth of Massachusetts**

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. 10-2741-BLS2

Cambridge Place Investment Management, Inc. , Plff(s).

v.

Morgan Stanley & Co., Inc., et al. , Deft(s).

SUMMONS
(Mass. R. Civ. P. 4)

(AFFIX FILING STAMP HERE)

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) B.L.S. 10-2741 | Trial Court of Massachusetts Superior Court Department County: SUFFOLK  |
|---|---|---|

| PLAINTIFF(S) CAMBRIDGE PLACE INVESTMENT MANAGEMENT INC. | DEFENDANT(S) MORGAN STANLEY & CO., INC. AND DEFENDANTS LISTED ON ATTACHED SHEET |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE T. Christopher Donnelly/Michael S. D'Orsi   617-720-2880 DONNELLY, CONROY & GELHAAR, LLP One Beacon St., 33rd Fl., Boston, MA 02108 (TCD BBO #129930/MSD BBO #566960) | ATTORNEY (if known) |

**RECEIVED**
JUL 09 2010
SUPERIOR COURT · CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

Origin Code
Original Complaint

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BB.2 | Claims relating to or arising out of securities trans. | (B) | (X) Yes  ( ) No |

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

This action concerns the offer and sale of more than $2 billion of residential mortgage-backed securities by the Defendants by means of untrue statements of material facts and omissions of material facts, in Massachusetts, in violation of Mass. Gen. Laws c. 110A, § 410. The Defendants' untrue statements and omissions concerned (1) the mortgage originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the loan-to-value ("LTV") ratios, debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Defendants' due diligence of the loans and the originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of securities. As set forth in the Complaint, the case involves approximately 200 offerings of securities. Defendants' untrue statements and omissions were directed to Plaintiff in Massachusetts, who made purchase decisions for its clients. Plaintiff is the exclusive assignee of, and the exclusive attorney-in-fact for and with respect to, its clients' claims relating to the offers and sales of the securities that are the subject of the Complaint. As expressly provided by Mass. Gen. Laws c. 110A, § 410, Plaintiff seeks (i) the consideration paid for the securities, together with statutory interest from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities, upon the tender of the securities, or (ii) damages in the amount that would be recoverable upon a tender of the securities less the value of the securities when the buyer disposed of them, statutory interest from the date of disposition, costs, and reasonable attorneys' fees. This case falls squarely within Category BB.2 (claims relating to or arising out of securities transactions) and, given the number of defendants and number of involved securities offerings, will benefit from case management in the Business Litigation Session.

*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: 7/9/10

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

**DEFENDANTS**

CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; RBS SECURITIES, INC.; DEUTSCHE BANK SECURITIES, INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; UBS SECURITIES LLC; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES INC.; COUNTRYWIDE SECURITIES CORPORATION; FBR CAPITAL MARKETS & CO.; HSBC SECURITIES (USA), INC.; BANC OF AMERICA SECURITIES LLC; RESIDENTIAL FUNDING SECURITIES, LLC; BARCLAYS CAPITAL INC.; ACCREDITED MORTGAGE LOAN REIT TRUST; ACE SECURITIES CORPORATION; AEGIS ASSET BACKED SECURITIES CORPORATION; ALLIANCE SECURITIES CORPORATION; AMERICAN HOME MORTGAGE ASSETS LLC; AMERIQUEST MORTGAGE SECURITIES INC.; ARGENT SECURITIES INC.; ASSET BACKED FUNDING CORPORATION; ASSET BACKED SECURITIES CORPORATION; BANC OF AMERICA MORTGAGE SECURITIES, INC.; BCAP LLC; BEAR STEARNS ASSET BACKED SECURITIES I LLC; CITIGROUP MORTGAGE LOAN TRUST INC.; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; CWABS, INC.; CWALT, INC.; FBR SECURITIZATION, INC.; FIELDSTONE MORTGAGE INVESTMENT CORPORATION; FINANCIAL ASSET SECURITIES CORP.; FREMONT MORTGAGE SECURITIES CORPORATION; GS MORTGAGE SECURITIES CORP.; HSI ASSET SECURITIZATION CORPORATION; J.P. MORGAN ACCEPTANCE CORPORATION I; LONG BEACH SECURITIES CORP.; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MORGAN STANLEY ABS CAPITAL I INC.; MORGAN STANLEY CAPITAL I INC.; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; NATIONSTAR FUNDING LLC; NEW CENTURY MORTGAGE SECURITIES LLC; NEW CENTURY MORTGAGE SECURITIES, INC.; NOVASTAR MORTGAGE FUNDING CORPORATION; PARK PLACE SECURITIES, INC.; PEOPLE'S CHOICE HOME LOAN SECURITIES CORP.; POPULAR ABS, INC.; RESIDENTIAL ACCREDIT LOANS, INC.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; RESIDENTIAL ASSET SECURITIES CORPORATION; SACO I INC.; SAXON ASSET SECURITIES COMPANY; SECURITIZED ASSET BACKED RECEIVABLES LLC; STANWICH ASSET ACCEPTANCE COMPANY, L.L.C.; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.



COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTION NO.

CAMBRIDGE PLACE INVESTMENT
MANAGEMENT INC.,

                          Plaintiff,

        v.

MORGAN STANLEY & CO., INC.;
CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
RBS SECURITIES, INC.; DEUTSCHE
BANK SECURITIES, INC.; MERRILL
LYNCH, PIERCE, FENNER & SMITH,
INC.; UBS SECURITIES LLC; GOLDMAN,
SACHS & CO.; J.P. MORGAN SECURITIES
INC.; COUNTRYWIDE SECURITIES
CORPORATION; FBR CAPITAL
MARKETS & CO.; HSBC SECURITIES
(USA), INC.; BANC OF AMERICA
SECURITIES LLC; RESIDENTIAL
FUNDING SECURITIES, LLC; BARCLAYS
CAPITAL INC.; ACCREDITED
MORTGAGE LOAN REIT TRUST; ACE
SECURITIES CORPORATION; AEGIS
ASSET BACKED SECURITIES
CORPORATION; ALLIANCE SECURITIES
CORPORATION; AMERICAN HOME
MORTGAGE ASSETS LLC; AMERIQUEST
MORTGAGE SECURITIES INC.; ARGENT
SECURITIES INC.; ASSET BACKED
FUNDING CORPORATION; ASSET
BACKED SECURITIES CORPORATION;
BANC OF AMERICA MORTGAGE
SECURITIES, INC.; BCAP LLC; BEAR
STEARNS ASSET BACKED SECURITIES I
LLC; CITIGROUP MORTGAGE LOAN
TRUST INC.; CREDIT SUISSE FIRST

COMPLAINT and       10  2741
JURY DEMAND

RECEIVED

JUL 09 2010

SUPERIOR COURT · CIVIL
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

[CAPTION CONTINUED
ON NEXT PAGE]

BOSTON MORTGAGE SECURITIES CORP.; CWABS, INC.; CWALT, INC.; FBR SECURITIZATION, INC.; FIELDSTONE MORTGAGE INVESTMENT CORPORATION; FINANCIAL ASSET SECURITIES CORP.; FREMONT MORTGAGE SECURITIES CORPORATION; GS MORTGAGE SECURITIES CORP.; HSI ASSET SECURITIZATION CORPORATION; J.P. MORGAN ACCEPTANCE CORPORATION I; LONG BEACH SECURITIES CORP.; MERRILL LYNCH MORTGAGE INVESTORS, INC.; MORGAN STANLEY ABS CAPITAL I INC.; MORGAN STANLEY CAPITAL I INC.; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; NATIONSTAR FUNDING LLC; NEW CENTURY MORTGAGE SECURITIES LLC; NEW CENTURY MORTGAGE SECURITIES, INC.; NOVASTAR MORTGAGE FUNDING CORPORATION; PARK PLACE SECURITIES, INC.; PEOPLE'S CHOICE HOME LOAN SECURITIES CORP.; POPULAR ABS, INC.; RESIDENTIAL ACCREDIT LOANS, INC.; RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; RESIDENTIAL ASSET SECURITIES CORPORATION; SACO I INC.; SAXON ASSET SECURITIES COMPANY; SECURITIZED ASSET BACKED RECEIVABLES LLC; STANWICH ASSET ACCEPTANCE COMPANY, L.L.C.; STRUCTURED ASSET MORTGAGE INVESTMENTS II INC.; and WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.

                    Defendants.

## TABLE OF CONTENTS

Page

I.   NATURE OF THE ACTION .......................................................................................1

II.  JURISDICTION AND VENUE ...............................................................................3

III. THE PARTIES...........................................................................................................3

     a.   Plaintiff .............................................................................................................3

     b.   The Wall Street Bank Defendants.....................................................................4

     c.   The Depositor Defendants ...............................................................................11

IV.  FACTUAL BACKGROUND .................................................................................16

     a.   The Mechanics of Mortgage Securitization ...................................................16

     b.   Securitization of Mortgage Loans: The Traditional Model ...........................17

     c.   The Systemic Violation of Underwriting and Appraisal Standards in the
        Mortgage Securitization Industry ...................................................................19

     d.   The Wall Street Banks Conduct Less Due Diligence .....................................25

     e.   Plaintiff's Acquisition of the Securities ..........................................................28

V.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF
    MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE
    ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES....................30

     a.   New Century Mortgage Corporation ...............................................................31

        1.   Defendants Made Untrue Statements of Material Facts About New
           Century's Underwriting Standards and Practices ....................................31

        2.   New Century Violated Its Stated Underwriting Standards.......................34

     b.   Long Beach Mortgage Company .....................................................................39

        1.   Defendants Made Untrue Statements of Material Facts About Long
           Beach's Underwriting Standards and Practices ......................................39

        2.   Long Beach Violated Its Stated Underwriting Standards........................41

     c.   WaMu ...............................................................................................................49

        1.   Defendants Made Untrue Statements of Material Facts About
           WaMu's Underwriting  Standards and Practices ....................................49

|   |   | 2. | WaMu Violated Its Stated Underwriting Standards | 50 |
|   | d. | | Fremont Investment & Loan | 60 |
|   |   | 1. | Defendants Made Untrue Statements of Material Facts About Fremont's Underwriting Standards and Practices | 60 |
|   |   | 2. | Fremont Violated Its Stated Underwriting Standards | 62 |
|   | e. | | WMC Mortgage Corporation | 69 |
|   |   | 1. | Defendants Made Untrue Statements of Material Facts About WMC's Underwriting Standards and Practices | 69 |
|   |   | 2. | WMC Violated Its Stated Underwriting Standards | 72 |
|   | f. | | The Ameriquest Loan Sellers | 74 |
|   |   | 1. | Defendants Made Untrue Statements of Material Facts About the Ameriquest Loan Sellers' Underwriting Standards and Practices | 74 |
|   |   | 2. | The Ameriquest Loan Sellers Violated Their Stated Underwriting Standards | 77 |
|   | g. | | Option One | 80 |
|   |   | 1. | Defendants Made Untrue Statements of Material Facts About Option One's Underwriting Standards and Practices | 80 |
|   |   | 2. | Option One Violated Its Stated Underwriting Standards | 82 |
|   | h. | | Additional Mortgage Originators | 85 |
| VI. | | | DEFENDANTS MADE MATERIAL UNTRUE STATEMENTS AND OMISSIONS | 87 |
|   | a. | | Morgan Stanley's Untrue Statements of Material Facts and Omissions | 88 |
|   | b. | | Bear Stearns' Untrue Statements of Material Facts and Omissions | 95 |
|   | c. | | Citigroup's Untrue Statements of Material Facts and Omissions | 102 |
|   | d. | | Credit Suisse's Untrue Statements of Material Facts and Omissions | 107 |
|   | e. | | Greenwich Capital's Untrue Statements of Material Facts and Omissions | 113 |
|   | f. | | Deutsche Bank's Untrue Statements of Material Facts and Omissions | 117 |
|   | g. | | Merrill Lynch's Untrue Statements of Material Facts and Omissions | 121 |

h.     UBS's Untrue Statements of Material Facts and Omissions .............................126

i.     Goldman Sachs' Untrue Statements of Material Facts and Omissions .............131

j.     J.P. Morgan's Untrue Statements of Material Facts and Omissions....................135

k.     Countrywide's Untrue Statements of Material Facts and Omissions .................139

l.     FBR's Untrue Statements of Material Facts and Omissions .............................144

m.     HSBC's Untrue Statements of Material Facts and Omissions ...........................147

    1.     HASC 2005-NC2 .................................................................. 148

    2.     FFML 2006-FF5 ................................................................... 150

n.     Banc of America's Untrue Statements of Material Facts and Omissions............153

o.     GMAC's Untrue Statements of Material Facts and Omissions ...........................157

p.     Barclays' Untrue Statements of Material Facts and Omissions...........................159

q.     The Depositor Defendants' Untrue Statements of Material Facts and
    Omissions...................................................................................................163

VII.   THE PERFORMANCE AND VALUE OF THE SECURITIES ....................................165

VIII.  COUNT I AGAINST THE WALL STREET BANK DEFENDANTS:
    VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS.
    GEN. LAWS CH. 110A § 410(A)(2) ..................................................................174

IX.    COUNT II AGAINST THE DEPOSITOR DEFENDANTS: VIOLATION OF
    MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH.
    110A § 410(A)(2) .................................................................................................175

X.     COUNT III AGAINST THE WALL STREET BANK DEFENDANTS:
    VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS.
    GEN. LAWS CH. 110A § 410(B) ..................................................................176

XI.    RELIEF REQUESTED...................................................................................178

XII.   JURY DEMAND ...........................................................................................178

## I.   NATURE OF THE ACTION

1.     The Defendants identified below in ¶¶ 15-32 offered or sold approximately $2.4 billion of residential mortgage-backed securities (the "Securities" or "RMBS") to the investor Plaintiff (as defined in ¶¶ 11-13), by means of untrue statements of material facts and omissions of material fact.   As a result of Defendants' untrue statements to Plaintiff in Massachusetts, Plaintiff has incurred losses exceeding $1.2 billion.   Defendants' written and oral untrue statements concerned: (1) the mortgage originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the loan-to-value ("LTV") ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities.

2.     Defendants' statements of material facts were not true.   In reality, each of the Defendants offered to sell and sold Securities backed by mortgages that came from a small group of now notorious subprime mortgage originators that violated their own underwriting standards, used faulty appraisals that overvalued the mortgaged properties, and accepted untrue information in loan applications.

3.     The Wall Street Bank Defendants were complicit in creating an environment of improper lending practices by the mortgage originators; indeed, in many instances the Wall Street Banks had personnel on site at the mortgage originators to monitor their loan underwriting practices.   The Wall Street Bank Defendants also fostered the environment for, permitted, and profited from the mortgage originators' rampant violations of sound lending practices.   Driven to profit from the lucrative securitization business, the Wall Street Bank Defendants demanded enormous volumes of loans to securitize and sell to investors in the form of RMBS, leading to erosion in lending standards.

4.    As a result of the relationships between mortgage originators and the Wall Street Bank Defendants, the Wall Street Banks had superior access to information about the business and lending practices of the mortgage originators and data about the loans, such as loan attributes, beyond what was conveyed to investors in the offering documents for RMBS. Nevertheless, the Wall Street Bank Defendants repeated the untrue information from the mortgage originators in the offering documents used to sell the Securities to investors.

5.    While the Wall Street Banks stated to Plaintiff that they performed careful due diligence into the loans and the mortgage originators' underwriting practices, the Wall Street Banks conducted inadequate due diligence and failed to satisfy their own responsibilities. Thus, the statements of material facts that these Wall Street Banks made to Plaintiff in Massachusetts while offering or selling the Securities were untrue and omitted material information.

6.    In addition, the Wall Street Banks materially aided the Depositor Defendants, who also offered or sold the Securities to the Plaintiff. The Depositor Defendants are Special Purpose Vehicles ("SPVs") that were created as part of the securitization process to acquire and securitize the loans for sale to investors. Working together with the Wall Street Banks, the Depositor Defendants drafted the offering documents that contained the untrue statements of material facts and circulated them to investors.

7.    The Plaintiff brings this action to recover damages incurred as a result of the Defendants' offer or sale of securities in Massachusetts by means of untrue statements of material facts or omissions of material facts in violation of Mass. Gen. Laws Ch. 110A, § 410 (the "Massachusetts Securities Act").

8.    Plaintiff alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief are based on the investigation conducted by and through counsel. The investigation included interviews with confidential witnesses; documents filed in connection with investigations and actions brought by the United States Securities and Exchange Commission (the "SEC"), the Attorneys General of Massachusetts, New York, and California, and private litigants; testimony

before the Federal Financial Crisis Inquiry Commission; a report of a court-appointed bankruptcy trustee; news reports; interviews published in the financial press; Congressional testimony; and other available information. Some of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## II.    JURISDICTION AND VENUE

9.    Jurisdiction is proper because the offer or sale of the Securities by the Defendants occurred in Massachusetts (see Mass. Gen. Laws Ch. 110A, § 414). In addition, Plaintiff's principal place of business is located in the Commonwealth of Massachusetts, and many of the Defendants have offices in Massachusetts. The amount in controversy exceeds $25,000.

10.    Venue is proper pursuant to Mass. Gen. Laws Ch. 223, § 1 and Superior Court Administrative Directive No. 09-01 because many of the Defendants have usual places of business in Suffolk County.

## III.   THE PARTIES

### a.    Plaintiff

11.    Cambridge Place Investment Management Inc. ("CPIM") is a Delaware corporation with its principal place of business in Concord, Massachusetts.

12.    CPIM was responsible for the sourcing, review, analysis, and purchase decisions for U.S. investments for its clients, including Caliber Global Investment Ltd., CAMBER 3 PLC, CAMBER 4 PLC, CAMBER 5 Ltd, CAMBER 7 PLC, CPIM Structured Credit Fund 20 LP, CPIM Structured Credit Fund 500 LP, CPIM Structured Credit Fund 1000 LP, and CPIM Structured Credit Fund 1500 LP (collectively, the "Clients").

13.    CPIM is the exclusive assignee of, and the exclusive attorney-in-fact for and with respect to, all of the Clients' claims relating to the offer and sale of Securities that are the subject of this Complaint. CPIM, as such exclusive assignee and attorney-in-fact of the Clients, is referred to herein as the "Plaintiff."

14.     Plaintiff was solicited in Massachusetts by investment firms, underwriters, and dealers (the "Wall Street Bank Defendants") and by the Depositor Defendants (as defined in ¶ 31), who offered or sold the Securities to Plaintiff.

**b.     The Wall Street Bank Defendants**

15.     **Morgan Stanley & Co., Inc.**: Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1585 Broadway, New York, New York 10036 and an office located at 1 International Place, Boston, Massachusetts 02110. The Defendant Morgan Stanley is the broker-dealer subsidiary of Morgan Stanley, a Delaware corporation headquartered in New York, New York. Defendant Morgan Stanley offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Morgan Stanley sales representatives who offered or sold Securities to Plaintiff included Howard Hennick, Paul Knepple, and Ryan Rossitto. Morgan Stanley, Knepple, and Rossitto are all licensed to sell securities in Massachusetts. Other Morgan Stanley representatives who offered or sold Securities to Plaintiff included investment bankers Michael Dubeck, Howard Hubler, Steven Shapiro (who is also licensed to sell securities in Massachusetts), and Terry Smith. The Securities that Morgan Stanley offered or sold to Plaintiff are listed in Appendix A.

16.     **Citigroup Global Markets, Inc.**: Defendant Citigroup Global Markets, Inc. ("Citigroup") is a New York corporation and an SEC-registered broker-dealer with its principal place of business located at 388 Greenwich Street, New York, New York. Citigroup representatives from Citigroup's office located at 2 International Place, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Citigroup sales representatives who offered or sold Securities to Plaintiff included Douglas Meyer, John W. Murray (the manager of Citigroup's Boston office), and David Crean. Citigroup, Murray, and Crean are all licensed to sell securities in Massachusetts. Other

4

Citigroup representatives who offered or sold Securities to Plaintiff included investment bankers James Demare, Matthew Cherwin, and Philip Seares (who is also licensed to sell securities in Massachusetts). The Securities that Citigroup offered or sold to Plaintiff are listed in Appendix B.

17. **Credit Suisse Securities (USA) LLC**: Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 11 Madison Avenue, New York, New York. Credit Suisse representatives from Credit Suisse's office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Credit Suisse sales representatives who offered or sold Securities to Plaintiff included James "Jay" Allen (the manager of Credit Suisse's Boston office) and Andrew Mingle. Credit Suisse, Allen, and Mingle are all licensed to sell securities in Massachusetts. Other Credit Suisse representatives who offered or sold Securities to Plaintiff included syndicate manager Tricia Hazelwood and investment bankers Christopher Schoen, Patrick Dodman, Gregory Richter, and Mark Tecotzky. The Securities that Credit Suisse offered or sold to Plaintiff are listed in Appendix C.

18. **RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc.**: Defendant RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. ("Greenwich Capital"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 600 Washington Boulevard, Stamford, Connecticut. Greenwich Capital representatives from Greenwich Capital's office located at 28 State Street, Boston, Massachusetts 02109, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Greenwich Capital sales representatives who offered or sold Securities to Plaintiff included Christopher J. Csrnko and Jeffrey Dimodica. Greenwich Capital, Csrnko, and Dimodica are all licensed to sell securities in Massachusetts. Other Greenwich Capital representatives who offered or sold

Securities to Plaintiff included investment banker Adam Smith. The Securities that Greenwich Capital offered or sold to Plaintiff are listed in Appendix D.

19.   **Deutsche Bank Securities Inc.**:   Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 60 Wall Street, New York, New York. Deutsche Bank representatives from Deutsche Bank's office located at 225 Franklin Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Deutsche Bank sales representatives who offered or sold Securities to Plaintiff included Alexandra DaCosta, Christopher Del Col, Laurence Pike, and Chris Walter. Deutsche Bank, DaCosta, Del Col, and Pike are all licensed to sell securities in Massachusetts. Other Deutsche Bank representatives who offered or sold Securities to Plaintiff included syndicate managers Fred Brettschneider (who is also licensed to sell securities in Massachusetts) and Brian Wiele, trader Greg Lippman, and investment bankers Michael Commaroto, Paul Mangione, Joseph Swartz, and Ryan Stark. The Securities that Deutsche Bank offered or sold to Plaintiff are listed in Appendix E.

20.   **Merrill Lynch, Pierce, Fenner & Smith, Inc.**:   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York. Merrill Lynch is a wholly owned subsidiary of Merrill Lynch & Co., which became a wholly owned subsidiary of Bank of America Corporation on January 1, 2009. Merrill Lynch representatives from Merrill Lynch's office located at 1 Financial Center, Boston, Massachusetts 02111, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Merrill Lynch sales representatives who offered or sold Securities to Plaintiff included William Farrell, James Peck, and Greg St. Pierre. Merrill Lynch, Farrell, Peck, and St. Pierre are all licensed to sell securities in Massachusetts. Other Merrill Lynch

representatives who offered or sold Securities to Plaintiff included investment bankers Matthew Whalen, Paul Park, and Ketan Parekh.  The Securities that Merrill Lynch offered or sold to Plaintiff are listed in Appendix F.

21.   **UBS Securities LLC**: Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 677 Washington Boulevard, Stamford, Connecticut 06901 and an office located at 1 International Place, Boston, Massachusetts 02110.  UBS offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The UBS sales representatives who offered or sold Securities to Plaintiff included Blake Myers.  UBS and Myers are licensed to sell securities in Massachusetts.  Other UBS representatives who offered or sold Securities to Plaintiff included syndicate managers Jack McCleary and Richard Onkey and investment bankers Jeffrey "Jay" Lown, Carole Mortenson, and Ketan Parekh.  The Securities that UBS offered or sold to Plaintiff are listed in Appendix G.

22.   **Goldman, Sachs & Co.**: Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a New York partnership and an SEC-registered broker-dealer with its principal place of business located at 200 West Street, New York, NY 10282.  Goldman Sachs maintains an office at 125 High Street, Boston, Massachusetts 02110.  Goldman Sachs offered or sold the Securities to Plaintiff in at least one face-to-face meeting and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Goldman Sachs sales representatives who offered or sold Securities to Plaintiff included Michael Cagnassola, Eric Feinstein, Samuel Hancock, and Lorin Radtke.  Goldman Sachs, Cagnassola, Feinstein, Hancock, and Radtke are all licensed to sell securities in Massachusetts.  Other Goldman Sachs representatives who offered or sold Securities to Plaintiff included investment banker Kevin Gasvoda, who is also licensed to sell securities in Massachusetts.  The Securities that Goldman Sachs offered or sold to Plaintiff are listed in Appendix H.

23. **J.P. Morgan Securities Inc.:** Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179. J.P. Morgan is a wholly owned subsidiary of JPMorgan Chase & Co., a financial holding company with its principal place of business located at 270 Park Avenue, New York, New York 10017. J.P. Morgan maintains an office at 2 International Place, Boston, Massachusetts 02110. J.P. Morgan offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The J.P. Morgan sales representatives who offered or sold Securities to Plaintiff included James McLaughlin of J.P. Morgan's Boston office. J.P. Morgan and McLaughlin are both licensed to sell securities in Massachusetts. Other J.P. Morgan representatives who offered or sold Securities to Plaintiff included syndicate managers Andrew Cherna (who is also licensed to sell securities in Massachusetts) and Brian McDonald. The Securities that J.P. Morgan offered or sold to Plaintiff are listed in Appendix I.

24. **J.P. Morgan, successor to Bear Stearns:** In addition to Plaintiff's claims based on J.P. Morgan's own offers or sales of Securities to Plaintiff, Plaintiff also brings claims against J.P. Morgan as successor-in-interest to Bear Stearns & Co., Inc. ("Bear Stearns"), which was a Delaware corporation and was an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179. On October 1, 2008, J.P. Morgan merged with and into Bear Stearns, with the surviving entity being Defendant J.P. Morgan. Bear Stearns representatives from Bear Stearns' office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Bear Stearns sales representatives who offered or sold Securities to Plaintiff included Daniel Kenslea, Jr., Felix Moy, Andrew Reese, and Steven Scari. Bear Stearns was, and Kenslea, Moy, Reese, and Scarri all are, licensed to sell securities in Massachusetts. Other Bear Stearns representatives who offered or sold Securities to Plaintiff

included investment bankers Scott Eichel, Keith Lind, and Chris Scott.  Eichel and Lind are also licensed to sell securities in Massachusetts.  The Securities that Bear Stearns offered or sold to Plaintiff are listed in Appendix J.

25.   **Countrywide Securities Corporation**:   Defendant Countrywide Securities Corporation ("Countrywide") is a California corporation with its principal place of business located at 4500 Park Granada, Calabasas, California.  Countrywide was an SEC-registered broker-dealer during the relevant period.  Countrywide was a subsidiary of Countrywide Financial Corporation, which merged on July 1, 2008 with a wholly owned subsidiary of Bank of America Corporation, making Countrywide an indirect wholly owned subsidiary of Bank of America.  Countrywide offered or sold the Securities to Plaintiff in Massachusetts by telephone calls and sending documents to Plaintiff in Massachusetts.  The Countrywide sales representatives who offered or sold Securities to Plaintiff included Matthew Kennedy, who is licensed to sell securities in Massachusetts, and Elaine Pang.  The Securities that Countrywide offered or sold to Plaintiff are listed in Appendix K.

26.   **FBR Capital Markets & Co., f/k/a/ Friedman, Billings, Ramsey & Co., Inc.**:  Defendant FBR Capital Markets & Co., formerly known as Friedman, Billings, Ramsey & Co., Inc. ("FBR"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1001 Nineteenth Street North, Arlington, Virginia 22209.  FBR maintains an office at 100 Federal Street, Boston, Massachusetts 02110.  FBR offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The FBR sales representatives who offered or sold Securities to Plaintiff included John Calabrese.  Other FBR representatives who offered or sold Securities to Plaintiff included investment bankers Paul Miller and Scott Valentin.  FBR, Calabrese, Miller, and Valentin are all licensed to sell securities in Massachusetts.  The Securities that FBR offered or sold to Plaintiff are listed in Appendix L.

27.   **HSBC Securities (USA), Inc.**:   Defendant HSBC Securities (USA), Inc. ("HSBC") is a Delaware corporation and an SEC-registered broker-dealer with its principal place

of business located at 452 Fifth Avenue, New York, New York.  HSBC offered or sold the Securities to Plaintiff in Massachusetts by making telephone calls and sending documents to Plaintiff in Massachusetts.  The HSBC sales representatives who offered or sold Securities to Plaintiff included Michael Sheldon and Wendy Horn.  HSBC and Horn are licensed to sell securities in Massachusetts.  Other HSBC representatives who offered or sold Securities to Plaintiff included investment bankers Jon Voigtman, Martin Priest, and Thomas Benz.  The Securities that HSBC offered or sold to Plaintiff are listed in Appendix M.

28.    **Banc of America Securities LLC**: Defendant Banc of America Securities LLC ("Banc of America") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York 10036.  Banc of America offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  Banc of America's sales representatives who offered or sold Securities to Plaintiff included Thomas Kanes and Kalefe Wright.  Banc of America, Kanes, and Wright are all licensed to sell securities in Massachusetts.  Other Banc of America representatives who offered or sold Securities to Plaintiff included syndicate manager Patrick Beranek (who is also licensed to sell securities in Massachusetts) and investment bankers Chris Henteman, Paul Jablansky (who is also licensed to sell securities in Massachusetts), and Jeff Willoughby.  The Securities that Banc of America offered or sold to Plaintiff are listed in Appendix N.

29.    **Residential Funding Securities, LLC, d/b/a GMAC RFC Securities**: Defendant Residential Funding Securities, LLC, f/k/a Residential Funding Securities Corporation ("GMAC"), is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Meridan Crossings, Richfield, Minnesota 55423.  Representatives of GMAC offered or sold the Securities to Plaintiff in at least one meeting in Massachusetts and by making telephone calls and sending documents to Plaintiff in Massachusetts.  GMAC sales representatives who offered or sold Securities to Plaintiff

10



included Robert Djorup and Ted Kallina. The Securities that GMAC offered or sold to Plaintiff are listed in Appendix O.

30.    **Barclays Capital Inc.**: Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation and an SEC-registered broker-dealer with its principal place of business located at 745 Seventh Avenue, New York, New York 10019, and an office at 125 High Street, Boston, Massachusetts 02110. Barclays offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. Barclays' sales representatives who offered or sold Securities to Plaintiff included James Hurst and Maria Palermo. Barclays and Hurst are licensed to sell securities in Massachusetts. Other Barclays representatives who offered or sold Securities to Plaintiff included investment bankers John Carroll and Paul Menefee. The Securities that Barclays offered or sold to Plaintiff are listed in Appendix P.

**c.    The Depositor Defendants**

31.    To securitize and sell mortgage loans to investors, financial institutions created SPVs to serve various roles in the securitization process. "Depositors" purchased or acquired the mortgage loans, securitized them, and were the "issuers" of the Securities. *See* 17 CFR § 230.191. Working together with the Wall Street Banks, the Depositor Defendants set forth in the table below prepared and circulated the registration statements, accompanying prospectuses, and subsequent prospectus supplements, or private placement memoranda, through which the Depositor Defendants and the Wall Street Bank Defendants offered and sold the Securities and filed the registration statements, prospectuses, and prospectus supplements with the SEC.

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| a | **Accredited Mortgage Loan REIT Trust,** 15253 Avenue of Science, San Diego, CA 92128 (Maryland) | ACCR 2005-3 |

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| b | **Ace Securities Corporation,** 6525 Morrison Blvd., Ste. 318, Charlotte, NC 28211 (Delaware) | ACE 2005-HE2, ACE 2005-HE5, ACE 2005-HE6, ACE 2005-HE7, ACE 2006-FM2, ACE 2006-HE1, ACE 2006-NC1, ACE 2006-NC2, ACE 2006-OP1, ACE 2006-SL1, ACE 2006-SL2, ACE 2007-HE2 |
| c | **Aegis Asset Backed Securities Corporation,** 3250 Briarpark, Ste 400, Houston, TX 77042 (Delaware) | AABST 2005-4, AABST 2005-5 |
| d | **Alliance Securities Corporation,** 1000 Marina Blvd., Ste. 100, Brisbane, CA 94005 (Delaware) | ALBT 2007-S1 |
| e | **American Home Mortgage Assets LLC,** 538 Broadhollow Road, Melville, NY 11747 (Delaware) | AHMA 2007-3 |
| f | **Ameriquest Mortgage Securities Inc.,** 1100 Town & Country Road, Orange, CA 92868 (Delaware) | AMSI 2005-R6, AMSI 2005-R7, AMSI 2005-R8, AMSI 2006-R2 |
| g | **Argent Securities Inc.,** 1100 Town & Country Rd, Orange, CA 92868 (Delaware) | ARSI 2005-W2, ARSI 2005-W3, ARSI 2006-W1, ARSI 2006-W3, ARSI 2006-W5 |
| h | **Asset Backed Funding Corp.,** 214 North Tryon St, Charlotte, NC 28255 (Delaware) | ABFC 2005-HE1, ABFC 2006-OPT2 |
| i | **Asset Backed Securities Corporation,** 11 Madison Ave., New York, NY 10010 (Delaware) | ABSHE 2005-HE1, ABSHE 2005-HE3, ABSHE 2005-HE4, ABSHE 2005-HE5, ABSHE 2006-HE3, ABSHE 2006-HE6, ABSHE 2007-HE7 |
| j | **Banc of America Mortgage Securities, Inc.,** 214 North Tryon St., Charlotte, NC 28255 (Delaware) | BOAA 2006-6 |
| k | **BCAP LLC,** 200 Park Avenue, New York, NY 10166 (Delaware) | BCAP 2006-6, EQLS 2007-1 |

| | Depositor Defendant,<br>Principal Place of Business<br>(State of Incorporation) | Offerings |
|---|---|---|
| l | **Bear Stearns Asset Backed Securities I LLC**, 383 Madison Ave, New York, NY 10179 (Delaware) | AMIT 2005-1, BSABS 2005-AQ2, BSABS 2005-HE10, BSABS 2005-HE4, BSABS 2005-HE8, BSABS 2005-HE9, BSABS 2006-EC1, BSABS 2006-EC2, BSABS 2006-HE1, BSABS 2006-HE10, BSABS 2006-HE3, BSABS 2006-HE4, BSABS 2006-HE7, BSABS 2006-PC1, BSABS 2007-FS1, BSMF 2007-SL2, GPMF 2007-HE1, IRWHE 2005-A, SACO 2005-5, SACO 2005-7, SACO 2005-8, SACO 2005-WM3, SACO 2007-2 |
| m | **Citigroup Mortgage Loan Trust Inc.**, 390 Greenwich Street, Fl 4, New York, NY 10013 (Delaware) | CARR 2005-NC3, CMLTI 2005-9, CMLTI 2005-HE1, CMLTI 2005-HE3, CMLTI 2006-HE1, CMLTI 2006-WFH3, CMLTI 2007-FS1 |
| n | **Credit Suisse First Boston Mortgage Securities Corp.**, 11 Madison Ave., New York, NY 10010 (Delaware) | HEAT 2005-1, HEAT 2005-2, HEAT 2005-3, HEAT 2005-4, HEAT 2005-5, HEAT 2005-6, HEAT 2005-7, HEAT 2005-8, HEAT 2005-9, HEAT 2006-4, HEAT 2006-7, HEMT 2005-5, HEMT 2006-2 |
| o | **CWABS, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWL 2005-11, CWL 2006-17, CWL 2006-18 |
| p | **CWALT, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWALT 2005-82, CWALT 2005-J6 |
| q | **FBR Securitization, Inc.**, 1001 Nineteenth St. North, Arlington, VA 22209 (Delaware) | FBRSI 2005-5 |
| r | **Fieldstone Mortgage Investment Corporation**, 11000 Broken Land Parkway, Ste 600, Columbia, MD 21044 (Maryland) | FMIC 2007-1 |
| s | **Financial Asset Securities Corp.**, 600 Steamboat Road, Greenwich, CT 06830 (Delaware) | EMLT 2005-1, FFML 2006-FF8, FHLT 2005-1, MMLT 2005-2, SVHE 2005-1, SVHE 2005-A, SVHE 2005-DO1, SVHE 2006-OPT2, SVHE 2006-OPT5 |
| t | **Fremont Mortgage Securities Corp.**, 2727 East Imperial Highway, Brea, CA 92821 (Delaware) | FHLT 2005-A |
| u | **GS Mortgage Securities Corp.**, 85 Broad St, New York, NY 10004 (Delaware) | GSAMP 2005-HE6, GSAMP 2006-HE6, GSAMP 2006-S1 |

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| v | **HSI Asset Securitization Corporation,** 452 Fifth Ave, New York, NY 10018 (Delaware) | FFML 2006-FF5, HASC 2005-NC2, HASC 2006-OPT3 |
| w | **J.P. Morgan Acceptance Corporation I,** 60 Wall Street, New York, NY 10260 (Delaware) | JPMAC 2005-FLD1, JPMAC 2005-OPT1, JPMAC 2005-OPT2, JPMAC 2005-WMC1, JPMAC 2006-CH1, JPMAC 2006-CW2, JPMAC 2006-WMC1 |
| x | **Long Beach Securities Corp.,** 1100 Town & Country Road, Orange, CA 92868 (Delaware) | LBMLT 2005-1, LBMLT 2005-2, LBMLT 2005-WL1, LBMLT 2005-WL2; LBMLT 2006-7, LBMLT 2006-WL1 |
| y | **Merrill Lynch Mortgage Investors, Inc.,** 250 Vesey Street, 4 World Financial Center, 10 Fl. New York, NY 10080 (Delaware) | FFMER 2007-H1; MLMI 2005-AR1, MLMI 2005-NCB, MLMI 2005-SL2, MLMI 2005-SL3, MLMI 2005-WMC1, MLMI 2006-HE4,  MLMI 2006-HE5, MLMI 2006-SL1, SURF 2005-BC1 |
| z | **Morgan Stanley ABS Capital I Inc.,** 1585 Broadway, New York, NY 10036 (Delaware) | AMIT 2005-4, IXIS 2005-HE2, IXIS 2005-HE3, IXIS 2005-HE4, IXIS 2006-HE3, MSAC 2005-HE4, MSAC 2005-NC2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, MSAC 2005-WMC6, MSAC 2006-HE3, MSAC 2007-HE3, MSHEL 2005-1, MSHEL 2006-1, NTIX 2007-HE2 |
| aa | **Morgan Stanley Capital I Inc.,** 1585 Broadway, New York, NY 10036 (Delaware) | MSAC 2006-HE1 |
| bb | **Mortgage Asset Securitization Transactions, Inc.,** 1285 Ave of the Americas, New York, NY 10019 (Delaware) | FFML 2005-FF7, MABS 2005-FRE1, MABS 2005-NC1, MABS 2006-AM2, MABS 2006-FRE2, MABS 2006-HE1, MABS 2006-NC2, MABS 2006-WMC4 |
| cc | **Nationstar Funding LLC,** 550 Highland Drive, Lewisville, TX 75067 (Delaware) | HELT 2007-FRE1 |
| dd | **New Century Mortgage Securities LLC,** 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-3, NCHET 2005-4, NCHET 2005-D |
| ee | **New Century Mortgage Securities, Inc.,** 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-B, NCHET 2005-C |
| ff | **NovaStar Mortgage Funding Corporation,** 8140 Ward Parkway, Ste. 300, Kansas City, MO 64114 (Delaware) | NHEL 2005-1, NHEL 2005-3 |

| | Depositor Defendant,<br>Principal Place of Business<br>(State of Incorporation) | Offerings |
|---|---|---|
| gg | **Park Place Securities, Inc.**, 1100 Town & Country Rd., Orange, CA 92868 (Delaware) | PPSI 2005-WHQ1, PPSI 2005-WHQ3 |
| hh | **People's Choice Home Loan Securities Corp.**, 7515 Irvine Center Drive, Irvine, CA 92618 (Delaware) | PCHLT 2005-2, PCHLT 2005-4 |
| ii | **Popular ABS, Inc.**, 103 Springer Building, 3411 Silverside Road, Wilmington, DE 19810 (Delaware) | POPLR 2005-5 |
| jj | **Residential Accredit Loans, Inc.**, 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RALI 2006-QS17 |
| kk | **Residential Asset Mortgage Products, Inc.**, 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RAMP 2005-EFC4, RAMP 2006-RZ3 |
| ll | **Residential Asset Securities Corporation**, 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RASC 2006-KS2, RASC 2006-KS6, RASC 2006-KS9 |
| mm | **SACO I Inc.**, 383 Madison Avenue, New York, NY 10179 (Delaware) | SACO 2005-1, SACO 2005-2, SACO 2005-3, SACO 2005-4, BSSLT 2007-SV1A |
| nn | **Saxon Asset Securities Company**, 4860 Cox Rd., Ste. 300, Glen Allen, VA 23060 (Virginia) | SAST 2005-2, SAST 2006-3, SAST 2007-2 |
| oo | **Securitized Asset Backed Receivables LLC**, 200 Park Avenue, New York, NY 10166 (Delaware) | SABR 2005-FR4, SABR 2005-FR5, SABR 2006-WM2 |
| pp | **Stanwich Asset Acceptance Company, L.L.C.**, 9 Greenwich Office Park, Greenwich, CT 06831 (Delaware) | CARR 2005-NC4, CARR 2005-NC5, CARR 2006-FRE1, CARR 2006-FRE2, CARR 2006-NC2, CARR 2006-NC4, CARR 2006-RFC1 |
| qq | **Structured Asset Mortgage Investments II Inc.**, 383 Madison Avenue, New York, NY 10179 (Delaware) | SAMI 2005-AR6 |
| rr | **Washington Mutual Mortgage Securities Corp.**, 1201 Third Avenue, WMT 1706, Seattle, WA 98101 (Delaware) | WAMU 2005-AR2 |

32.    The Defendants identified in ¶ 31 are collectively referred to herein as the "Depositor Defendants."

## IV.   FACTUAL BACKGROUND

### a.   The Mechanics of Mortgage Securitization

33.     Mortgage pass-through securities represent interests in a pool of mortgages; the securities are shares in the pool that are sold to investors. The securities represent an equity interest in the "issuing trust" that holds the pool. The pass-through securities entitle the holder to payments from the pool of mortgage loans. Although the structure and underlying collateral of the mortgages may vary, the basic principle of pass-through securities remains the same: The cash flow from the pool of mortgages is "passed through" to the securities holders when payments are made by the underlying mortgage borrowers.

34.     The first step in creating a mortgage pass-through security is the acquisition by a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the loans or acquires the loans from other mortgage originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed-rate or adjustable-rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to an "issuing trust."

35.     The depositor then securitizes the pool of loans in the issuing trust so that the rights to the cash flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches consist of multiple series of related RMBS offered as part of the same offering, each with a different level of risk and reward. Any losses on the underlying loans - whether due to default, delinquency, or otherwise - are generally applied in reverse order of seniority. As such, the most senior tranches of pass-through securities are rated as the best quality, or "AAA/Aaa." Junior tranches, which usually obtained lower ratings, ranging from "AA/Aa" to "BB/Bb," are less insulated from risk, but offer greater potential returns.

36.     Once the tranches are established, the issuing trust passes the securities back to the depositor, who becomes the issuer of those securities, like the Depositor Defendants herein.

The depositor then passes the securities to one or more Wall Street banks, who offer and sell the securities to investors in exchange for cash that is passed back to the depositor, minus any fees owed to the Wall Street banks.

37.    Wall Street banks play a critical role in the securitization process.    They underwrite the sale of the securities, that is, they purchase the securities from the issuing trust through a depositor and then sell them to investors.  Importantly, the Wall Street banks provide the information that potential investors use to decide whether to purchase the securities.

38.    Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool.  The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originator develops while making the loans.   For residential mortgage loans, each loan file normally contains documents including the borrower's application for the loan; verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for important measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property.

39.    The collateral pool of loans for each securitization usually includes thousands of loans.  Instead of each potential investor reviewing thousands of loan files, the Wall Street banks that underwrite the sale of the securities in a securitization are responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the trust.

**b.    Securitization of Mortgage Loans: The Traditional Model**

40.    In the 1980s and 1990s, mortgage originators and Wall Street banks fulfilled their respective obligations to comply with underwriting standards and provide accurate information to investors.  The mortgage securitization business, therefore, functioned well, to the benefit of home buyers, financial institutions, and investors.  For the securitization model to work properly,

the mortgage originators and the Wall Street banks must perform their roles properly. In particular, it is necessary for the mortgage originators to underwrite loans and appraise properties in accordance with their stated standards and to assure accurate information is obtained from loan applicants.  Likewise, it is necessary for the Wall Street banks to perform adequate due diligence into the loan pools and to provide accurate information to investors.

41.     In the traditional mortgage model, a mortgage originator originated loans to borrowers, held the loans to maturity, and therefore retained the credit (default) risk.  As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (1) the borrowers had the financial ability to repay the loans, and (2) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

42.     Traditionally, mortgage originators financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages.  When a mortgage originator held a mortgage through the term of the loan, the mortgage originator received revenue from the borrower's payment of interest and fees.  The mortgage originator also bore the risk of loss if the borrower defaulted and the value of the collateral was not sufficient to repay the loan.  As a result, the mortgage originator had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

43.     With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to distribute" model, in which mortgage originators sell the mortgages and transfer credit risk to investors through the issuance and sale of RMBS.  Through securitization, mortgage originators no longer hold the mortgage loans to maturity.  By selling the mortgages to investors through Wall Street banks, the mortgage originators obtain funds, enabling them to make more loans.  Securitization also enables mortgage originators to earn most of their income from transaction and loan-servicing fees, rather than from the spread between interest rates paid

on deposits and interest rates received on mortgage loans as in the traditional model. Thus, securitization gives the mortgage originators an incentive to increase the number of mortgages they issue and reduces their incentive to ensure the mortgages' credit quality. However, the contractual terms of the securitization transactions and good business practices obligate mortgage originators to underwrite loans in accordance with their stated policies and to obtain accurate appraisals of the mortgaged properties.

44.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, mortgage originators made loans in accordance with their stated underwriting and appraisal standards and provided accurate information about the loans, borrowers, and mortgaged properties to the Wall Street banks that securitized the loans. In turn, the Wall Street banks provided accurate information about the loans, borrowers, and properties to investors in the RMBS. In the 1980s and 1990s, most mortgage securitizations were conducted through the major Government Sponsored Enterprises (the "Agencies"), *i.e.*, the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). The Agencies purchased loans from mortgage originators and securitized the loans. These Agency securitizations had high credit quality because the Agencies required the underlying loans to be originated in accordance with strict underwriting guidelines. Most non-Agency mortgage securitizations during this period also complied with the Agencies' underwriting standards.

**c.     The Systemic Violation of Underwriting and Appraisal Standards in the Mortgage Securitization Industry**

45.     The securitization of mortgage loans fundamentally shifts the risk of loss from the mortgage originator to the investors who purchase RMBS. As discussed in Section IV.b above, traditionally, the mortgage originator had an economic incentive to verify mortgage borrowers' creditworthiness and obtain accurate appraisals of the value of the underlying properties before

issuing mortgage loans because the mortgage originator held the loans to maturity. In securitizations where the mortgage originator instead sells the loans to Wall Street banks, the mortgage originator does not have the same economic interest in verifying borrowers' creditworthiness or obtaining accurate appraisals in the loan origination process. Nevertheless, the mortgage securitization process worked well during the 1980s and 1990s because both mortgage originators and Wall Street banks played by the rules and complied with their obligations to underwrite loans responsibly and provide accurate information to investors in RMBS.

46.     Mortgage originators began systematically to violate their stated underwriting and appraisal standards, made loans with little or no documentation, and accepted untrue information from loan applicants. The mortgage originators also began to provide untrue information about their underwriting practices and about the borrowers, loans, appraisals, and mortgaged properties in connection with the securitization of the loans. As a result of this pervasive breakdown of compliance with proper practices among the mortgage originators, the Wall Street Banks that securitized mortgages provided Plaintiff with untrue information about the mortgage originators' practices and about the underlying mortgage borrowers, loans, and properties. The Wall Street Banks also provided Plaintiff with untrue information about their own due diligence of the mortgage originators and underlying loans.

47.     To fund their loans, the mortgage originators maintained credit facilities with warehouse lenders, including the Wall Street Banks. The Wall Street Banks loaned money to the mortgage originators pursuant to "warehouse agreements," so that the mortgage originators could continue to make loans to home buyers. The mortgage originators borrowed from these credit facilities to fund their loans, until the loans were sold and the warehouse agreement was repaid. When loans serving as collateral lost value, the Wall Street Banks made margin calls requiring the mortgage originators to pay cash back to the Wall Street Banks. As a result of the warehouse arrangements between the mortgage originators and the Wall Street Banks, the Wall Street Banks had superior access to information about the mortgage originators' business and lending practices

and the mortgage loans' characteristics and performance, including early warning signs of poor credit quality in loans before the loans were securitized.

48.    Fannie Mae and Freddie Mac provided investors in Agency-sponsored RMBS with protection by guaranteeing that the investors would receive timely payments of principal and interest.  If the borrower for one of the underlying mortgages failed to make scheduled principal or interest payments, the Agency that issued the RMBS would make the payments to the trust.  Because the Agencies were perceived to be backed by the federal government, investors viewed their guarantees as essentially removing the credit risk from Agency-sponsored RMBS.

49.    Between 2001 and 2006, non-Agency loan originations and securitizations increased dramatically, while Agency loan originations and securitizations decreased moderately, as summarized in the following table:

|  | 2001 | 2006 |
|---|---|---|
| Agency loan originations | $1.433 trillion | $1.040 trillion |
| Agency securitizations | $1.087 trillion | $904 billion |
| Non-Agency loan originations | $680 billion | $1.480 trillion |
| Non-Agency securitizations | $240 billion (including $87.1 billion of subprime securitizations) | $1.033 trillion (including $448 billion of subprime securitizations) |

Source: *Inside Mortgage Finance* (2007).

50.    Thus, from 2001 to 2006, non-Agency loan originations grew by approximately 115%; non-Agency securitizations grew by approximately 330%; and non-Agency securitizations of subprime loans grew by approximately 415%.  According to *Inside Mortgage Finance* (2009), non-Agency RMBS more than trebled in market share between 2003 and 2007, peaking at about 38% of the market in 2006, from 6% in 2003.  Another measure of the dramatic growth of the non-Agency RMBS market is that "[t]he amount of all outstanding mortgages held in non-[Agency] MBS rose notably from only $670 billion in 2004 to over $2,000 billion in

2006." Financial Crisis Inquiry Commission ("FCIC"), "Preliminary Staff Report: Securitization and the Mortgage Crisis," April 7, 2010.

51.     Starting in or about 2005, the growth in non-Agency mortgage securitizations was accompanied by widespread violation by the mortgage originators of their stated underwriting and appraisal standards.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 2008 speech, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."  The loan-to-value ("LTV") ratio is a significant measure of credit risk, because both the likelihood of default and the severity of loss are higher when borrowers have less equity to protect in the event of foreclosure.  The debt-to-income ratio is also a significant measure of credit risk, because borrowers who incur debt that is relatively high compared to their income are more likely to default on their loans.  In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original.)  As U.S. housing prices subsequently declined, the delinquency rates for such mortgages soared.

52.     An important aspect of the mortgage originators' violation of their stated underwriting standards was their reliance on faulty appraisals.  According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value."  He continued:

To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much 10%. This meant one out of two appraisals were still within an acceptable tolerance for our end investors. Our experience showed that 10% was the most an appraisal could be overvalued and still be purchased by these investors. Another quarter that we reviewed were overvalued by 11-20%. These loans were either declined or we reduced the property value to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. ***Throwing a dart at a board while blindfolded would've produced more accurate results.***[1]

53.     Mr. Bitner testified about the implications of inflated appraisals:

If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself. We saw it on several occasions. We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant. In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country.

*        *        *

If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to a lack of funds. Inevitably, this would have forced sellers to drop their exorbitant asking prices to more reasonable levels. The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.

Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

54.     Patricia Lindsay, a wholesale underwriter for 10 years at New Century Financial Corporation, testified before the FCIC on April 7, 2010, about the fraudulent practices of New Century's appraisers:

The role and practices of appraisers in subprime mortgage origination:

---

[1] Throughout this Complaint, emphasis in quotations is added except where otherwise noted.

Properly valuing a property . . . is one of the most important components in a loan. In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value. Some appraisers would take boards off boarded up windows, to take the needed photos, then board the properties back up once the shots were taken. Or they would omit certain important elements of a property by angling the camera a certain way or zooming close in to make the property look the best possible. This level of appraiser activism compromises their objectivity.

55.     Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on Banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

56.     A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review*, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation." Adding to these problems was the fact that lenders were generally unable to assess the accuracy of the appraisals for loans originated by mortgage brokers, since the lenders were typically located far from the properties and knew little about the properties' neighborhoods.

57.     In addition, the mortgage securitization process was undermined by the widespread industry practice of originating types of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which were made without any

24

disclosure of the borrower's income or assets; and (3) "No Doc" loans, which were made to borrowers who did not disclose their income, assets, or employment history.

    **d.**    <u>The Wall Street Banks Conduct Less Due Diligence</u>

    58.    As the Wall Street Banks that profited from securitizations sought increasing volumes of mortgage loans from mortgage originators, the mortgage originators gained bargaining power over the terms on which they would sell the loans. Mortgage originators demanded that the Wall Street Banks limit quality control reviews (*i.e.*, due diligence) to smaller percentages of loans prior to purchase. Additionally, if a Wall Street Bank chose to "kick out" a large number of loans from a pool – because the loans failed to conform to the mortgage originators' underwriting guidelines or did not contain adequate documentation – the Wall Street Bank risked being excluded from future loan purchases. As a result, the Wall Street Banks performed increasingly cursory due diligence on the mortgage loans they securitized. The sheer volume and pace of the securitization business during this period exacerbated such failures.

    59.    The Wall Street Banks often acquired large quantities of loans for securitization from "loan auctions." There, mortgage originators provided the Wall Street Banks with Bid Stipulation Sheets ("Bid Sheets") which stated the times and dates of the auctions and described the general characteristics of the loan pools. The Bid Sheets also dictated: (1) the percentage of the pool on which the Wall Street Banks would be permitted to conduct due diligence (*e.g.*, 25%); and (2) the number of loans the Wall Street Banks could "kick-out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of requisite legal documentation, and similar deficiencies. Prior to bid submission, mortgage originators also sent the Wall Street Banks spreadsheets known as "Loan Tapes" which typically contained 50 to 100 columns of data regarding the loans. The Wall Street Banks were supposed to "crack" the Loan Tapes, analyze them, and determine what prices to bid for the loan pools. Once this "bid package" analysis was complete, the Wall Street Banks submitted their bids.

    60.    If the mortgage originator accepted a bid, the Wall Street Bank typically had a short period of time prior to the settlement date (when cash was paid to the mortgage originator

for the loans) to conduct due diligence on the loans.  The Wall Street Banks generally used their own investment bankers to conduct due diligence.  Many of the Wall Street Banks also hired third-party due diligence firms such as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this review under the supervision of the Wall Street Banks' investment bankers.  Clayton's Form 10-K filed March 14, 2008 specifically identified Wall Street Bank Defendants Morgan Stanley and Deutsche Bank among its clients.  Bohan's clients included Bear Stearns (predecessor-in-interest to Wall Street Bank Defendant J.P. Morgan Securities) and Wall Street Bank Defendant Merrill Lynch.

61.     For each loan pool, Clayton and Bohan reviewed the percentage of loans designated in the Bid Sheet to ensure, *inter alia*, that the loans: (1) conformed to the mortgage originators' underwriting guidelines; (2) contained loan data matching the loan data in the Loan Tape; and (3) contained the appropriate mortgage documents.  Upon completion of the review, Clayton and Bohan sent the Wall Street Bank a "due diligence report," which it was supposed to use to decide which loans should be "kicked out" of the pool prior to the settlement date.  Wall Street Banks, however, were incentivized to kick-out as few loans as possible because, as explained above, (1) mortgage originators would not invite Wall Street Banks that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.

62.     As a result, the percentage of loans per pool that Clayton and Bohan were instructed to review declined with time.  Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006."  Bohan President Mark Hughes stated, "[b]y contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

63.     In June 2007, New York Attorney General Andrew Cuomo ("NYAG") subpoenaed documents from Clayton and Bohan related to their due diligence efforts.  The NYAG's investigation focused on whether Wall Street banks failed to adequately disclose the

warnings they received regarding the number of loans that failed to meet lending guidelines. Clayton also received an information request from the SEC and information subpoenas from the Massachusetts and Connecticut Attorneys General.

64.    On January 12, 2008, in an article entitled "Inquiry Focuses on Withholding of Data on Loans," the *New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.  Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.***  The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments.

65.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports.  That same day, in an article entitled "Loan Reviewer Aiding Inquiry Into Big Banks," the *New York Times* reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street Banks have Clayton and other consultants review fewer loans.  Incredibly, "investment banks directed Clayton *to halve the sample of loans it evaluated in each portfolio*."

66.    On March 17, 2008, in an article entitled "Sub-Prime mortgage watchdogs kept on leash; loan checkers say their warnings of risk were met with indifference," the *Los Angeles Times* reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

### e.   Plaintiff's Acquisition of the Securities

67.     Plaintiff, located in Massachusetts, was responsible for the sourcing, review, analysis, and purchase decisions for the U.S. investments for the Clients, and made the decision in Massachusetts to purchase the Securities on behalf of the Clients.  At all relevant times, Plaintiff had numerous employees in Concord, Massachusetts, and Plaintiff continues to have employees in Concord.

68.     Plaintiff decided to purchase each Security on behalf of the Clients on the basis of the information contained in the applicable registration statement, prospectus, and prospectus supplements filed with the SEC or the applicable private placement memorandum (the "Offering Documents"), as identified in Appendices A-P, and based on additional information provided to Plaintiff by the Wall Street Bank Defendants, as described below.  In connection with their offers or sales of the Securities to Plaintiff, the Wall Street Bank Defendants sent to Plaintiff's office in Massachusetts the Offering Documents and additional documents, such as statistical tables to be included in the prospectus supplements.  These documents included term sheets, pooling and servicing agreements, data, computational material, data regarding the LTV and debt-to-income ratios of the pools, computer models of the financial structures of the securitizations, tabular sensitivity data, loan tapes, rating agency expected loss levels, emails, sampling data regarding credit/compliance/appraisal and due diligence, "kickout" criteria and data, and collateral characteristics.  ("Kickout" refers to the mortgage originator's contractual obligation under the terms of the securitization transaction documents to repurchase or replace any mortgage loan that had deficient documentation, an uncured material breach of a representation or warranty, a payment default within a specified time period, or other specified deficiencies.)

69.     These documents contained numerous statements of material facts about the Securities, including statements concerning: (1) the mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios,

debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Banks' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities. For example, one form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loans in the pool for a securitization (and therefore presumably the total value of the underlying properties) exceeds the aggregate amount of Securities issued and sold in the securitization. Another example of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be higher than the interest distributable on the Securities and fees and expenses payable by the trust for that period; excess interest may be applied both to absorb any interest shortfalls and to pay principal on the Securities to the extent needed to maintain the required level of overcollateralization.

70.    These statements of material facts were untrue because: (1) the mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (2) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (3) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of the mortgage originators' acceptance of untrue information from mortgage applicants. For example, the mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported income. Stated income loans were therefore widely known among personnel of the mortgage originators as "liar loans."

71.    Often at meetings, including meetings in Massachusetts, the Wall Street Bank Defendants also showed Plaintiff "pitch books" and other materials regarding the credit quality of the Securities and the Wall Street Banks' due diligence of the mortgage originators' underwriting practices. Plaintiff, however, was not allowed to keep the pitch books. These pitch

books and other materials contained untrue statements similar to those described above.   In addition to the untrue statements and omissions in the documents provided or shown to Plaintiff, the Wall Street Bank Defendants made additional untrue oral statements to Plaintiff during face-to-face meetings and by telephone between 2005 and 2007.   The representatives of the Wall Street Bank Defendants who offered or sold the Securities to Plaintiff received compensation based, directly or indirectly, on the volume of Securities they sold to investors, including the Clients on whose behalf Plaintiff purchased Securities.

**V.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES**

72.   Most of the mortgage loans underlying the Securities purchased by Plaintiff on behalf of the Clients came from the following eight mortgage originators (the "Mortgage Originators"): New Century Mortgage Corp. ("New Century"), Long Beach Mortgage Company ("Long Beach"), Washington Mutual ("WaMu"), Fremont Investment & Loan ("Fremont"), WMC Mortgage Corporation ("WMC"), Argent Mortgage Company ("Argent"), Ameriquest Mortgage ("Ameriquest"), and Option One Mortgage Corporation ("Option One").   Together with Defendant Countrywide, which originated most of its own mortgage loans through its affiliates, these eight Mortgage Originators accounted for approximately 70% of the loans underlying the RMBS purchased by Plaintiff on behalf of the Clients.   The remaining 30% of the loans were originated by approximately 80 other mortgage originators.   On information and belief, the types of violations of underwriting and appraisal standards that are alleged below specifically with respect to each of the eight larger Mortgage Originators were also prevalent among the other, smaller mortgage originators.

73.   All eight of these large Mortgage Originators have now failed, and numerous consumer and securities fraud cases – both private and regulatory – have been lodged against them.   In an April 8, 2010 statement by John C. Dugan, Comptroller of the Currency, before the FCIC, these Mortgage Originators were identified among the "Worst Ten in the Worst Ten," a list of the worst mortgage originators based on the number of foreclosures in the nation's worst ten