# EXHIBIT A-2

**1**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
CIVIL ACTION NO.

10  2741 BLS

CAMBRIDGE PLACE INVESTMENT
MANAGEMENT INC.,

                    Plaintiff,

    v.

MORGAN STANLEY & CO., INC.;
CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
RBS SECURITIES, INC.; DEUTSCHE
BANK SECURITIES, INC.; MERRILL
LYNCH, PIERCE, FENNER & SMITH,
INC.; UBS SECURITIES LLC; GOLDMAN,
SACHS & CO.; J.P. MORGAN SECURITIES
INC.; COUNTRYWIDE SECURITIES
CORPORATION; FBR CAPITAL
MARKETS & CO.; HSBC SECURITIES
(USA), INC.; BANC OF AMERICA
SECURITIES LLC; RESIDENTIAL
FUNDING SECURITIES, LLC; BARCLAYS
CAPITAL INC.; ACCREDITED
MORTGAGE LOAN REIT TRUST; ACE
SECURITIES CORPORATION; AEGIS
ASSET BACKED SECURITIES
CORPORATION; ALLIANCE SECURITIES
CORPORATION; AMERICAN HOME
MORTGAGE ASSETS LLC; AMERIQUEST
MORTGAGE SECURITIES INC.; ARGENT
SECURITIES INC.; ASSET BACKED
FUNDING CORPORATION; ASSET
BACKED SECURITIES CORPORATION;
BANC OF AMERICA MORTGAGE
SECURITIES, INC.; BCAP LLC; BEAR
STEARNS ASSET BACKED SECURITIES I
LLC; CITIGROUP MORTGAGE LOAN
TRUST INC.; CREDIT SUISSE FIRST

COMPLAINT and
JURY DEMAND

[CAPTION CONTINUED
ON NEXT PAGE]

BOSTON MORTGAGE SECURITIES
CORP.; CWABS, INC.; CWALT, INC.; FBR
SECURITIZATION, INC.; FIELDSTONE
MORTGAGE INVESTMENT
CORPORATION; FINANCIAL ASSET
SECURITIES CORP.; FREMONT
MORTGAGE SECURITIES
CORPORATION; GS MORTGAGE
SECURITIES CORP.; HSI ASSET
SECURITIZATION CORPORATION; J.P.
MORGAN ACCEPTANCE CORPORATION
I; LONG BEACH SECURITIES CORP.;
MERRILL LYNCH MORTGAGE
INVESTORS, INC.; MORGAN STANLEY
ABS CAPITAL I INC.; MORGAN
STANLEY CAPITAL I INC.; MORTGAGE
ASSET SECURITIZATION
TRANSACTIONS, INC.; NATIONSTAR
FUNDING LLC; NEW CENTURY
MORTGAGE SECURITIES LLC; NEW
CENTURY MORTGAGE SECURITIES,
INC.; NOVASTAR MORTGAGE FUNDING
CORPORATION; PARK PLACE
SECURITIES, INC.; PEOPLE'S CHOICE
HOME LOAN SECURITIES CORP.;
POPULAR ABS, INC.; RESIDENTIAL
ACCREDIT LOANS, INC.; RESIDENTIAL
ASSET MORTGAGE PRODUCTS, INC.;
RESIDENTIAL ASSET SECURITIES
CORPORATION; SACO I INC.; SAXON
ASSET SECURITIES COMPANY;
SECURITIZED ASSET BACKED
RECEIVABLES LLC; STANWICH ASSET
ACCEPTANCE COMPANY, L.L.C.;
STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC.; and
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORP.

Defendants.

**TABLE OF CONTENTS**

Page

I.    NATURE OF THE ACTION .................................................................................1

II.   JURISDICTION AND VENUE .........................................................................3

III.  THE PARTIES.....................................................................................................3

    a.    Plaintiff ...................................................................................................3

    b.    The Wall Street Bank Defendants........................................................4

    c.    The Depositor Defendants ...................................................................11

IV.   FACTUAL BACKGROUND............................................................................16

    a.    The Mechanics of Mortgage Securitization........................................16

    b.    Securitization of Mortgage Loans: The Traditional Model ...................17

    c.    The Systemic Violation of Underwriting and Appraisal Standards in the
        Mortgage Securitization Industry .........................................................19

    d.    The Wall Street Banks Conduct Less Due Diligence ...........................25

    e.    Plaintiff's Acquisition of the Securities................................................28

V.    THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF
    MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE
    ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES.....................30

    a.    New Century Mortgage Corporation ....................................................31

        1.    Defendants Made Untrue Statements of Material Facts About New
            Century's Underwriting Standards and Practices .....................................31

        2.    New Century Violated Its Stated Underwriting Standards.......................34

    b.    Long Beach Mortgage Company .........................................................39

        1.    Defendants Made Untrue Statements of Material Facts About Long
            Beach's Underwriting Standards and Practices .......................................39

        2.    Long Beach Violated Its Stated Underwriting Standards.........................41

    c.    WaMu ...................................................................................................49

        1.    Defendants Made Untrue Statements of Material Facts About
            WaMu's Underwriting  Standards and Practices ......................................49

|   | | 2. | WaMu Violated Its Stated Underwriting Standards | 50 |

| | d. | Fremont Investment & Loan | | 60 |

| | | 1. | Defendants Made Untrue Statements of Material Facts About Fremont's Underwriting Standards and Practices | 60 |

| | | 2. | Fremont Violated Its Stated Underwriting Standards | 62 |

| | e. | WMC Mortgage Corporation | | 69 |

| | | 1. | Defendants Made Untrue Statements of Material Facts About WMC's Underwriting Standards and Practices | 69 |

| | | 2. | WMC Violated Its Stated Underwriting Standards | 72 |

| | f. | The Ameriquest Loan Sellers | | 74 |

| | | 1. | Defendants Made Untrue Statements of Material Facts About the Ameriquest Loan Sellers' Underwriting Standards and Practices | 74 |

| | | 2. | The Ameriquest Loan Sellers Violated Their Stated Underwriting Standards | 77 |

| | g. | Option One | | 80 |

| | | 1. | Defendants Made Untrue Statements of Material Facts About Option One's Underwriting Standards and Practices | 80 |

| | | 2. | Option One Violated Its Stated Underwriting Standards | 82 |

| | h. | Additional Mortgage Originators | | 85 |

| VI. | DEFENDANTS MADE MATERIAL UNTRUE STATEMENTS AND OMISSIONS | | | 87 |

| | a. | Morgan Stanley's Untrue Statements of Material Facts and Omissions | 88 |

| | b. | Bear Stearns' Untrue Statements of Material Facts and Omissions | 95 |

| | c. | Citigroup's Untrue Statements of Material Facts and Omissions | 102 |

| | d. | Credit Suisse's Untrue Statements of Material Facts and Omissions | 107 |

| | e. | Greenwich Capital's Untrue Statements of Material Facts and Omissions | 113 |

| | f. | Deutsche Bank's Untrue Statements of Material Facts and Omissions | 117 |

| | g. | Merrill Lynch's Untrue Statements of Material Facts and Omissions | 121 |

|  | h. | UBS's Untrue Statements of Material Facts and Omissions | 126 |
|  | i. | Goldman Sachs' Untrue Statements of Material Facts and Omissions | 131 |
|  | j. | J.P. Morgan's Untrue Statements of Material Facts and Omissions | 135 |
|  | k. | Countrywide's Untrue Statements of Material Facts and Omissions | 139 |
|  | l. | FBR's Untrue Statements of Material Facts and Omissions | 144 |
|  | m. | HSBC's Untrue Statements of Material Facts and Omissions | 147 |
|  |  | 1.   HASC 2005-NC2 | 148 |
|  |  | 2.   FFML 2006-FF5 | 150 |
|  | n. | Banc of America's Untrue Statements of Material Facts and Omissions | 153 |
|  | o. | GMAC's Untrue Statements of Material Facts and Omissions | 157 |
|  | p. | Barclays' Untrue Statements of Material Facts and Omissions | 159 |
|  | q. | The Depositor Defendants' Untrue Statements of Material Facts and Omissions | 163 |
| VII. | | THE PERFORMANCE AND VALUE OF THE SECURITIES | 165 |
| VIII. | | COUNT I AGAINST THE WALL STREET BANK DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(A)(2) | 174 |
| IX. | | COUNT II AGAINST THE DEPOSITOR DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(A)(2) | 175 |
| X. | | COUNT III AGAINST THE WALL STREET BANK DEFENDANTS: VIOLATION OF MASSACHUSETTS UNIFORM SECURITIES ACT, MASS. GEN. LAWS CH. 110A § 410(B) | 176 |
| XI. | | RELIEF REQUESTED | 178 |
| XII. | | JURY DEMAND | 178 |

## I.   NATURE OF THE ACTION

1.      The Defendants identified below in ¶¶ 15-32 offered or sold approximately $2.4 billion of residential mortgage-backed securities (the "Securities" or "RMBS") to the investor Plaintiff (as defined in ¶¶ 11-13), by means of untrue statements of material facts and omissions of material fact.  As a result of Defendants' untrue statements to Plaintiff in Massachusetts, Plaintiff has incurred losses exceeding $1.2 billion.  Defendants' written and oral untrue statements concerned: (1) the mortgage originators' underwriting standards that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal standards that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the loan-to-value ("LTV") ratios, debt-to-income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Bank Defendants' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities.

2.      Defendants' statements of material facts were not true.  In reality, each of the Defendants offered to sell and sold Securities backed by mortgages that came from a small group of now notorious subprime mortgage originators that violated their own underwriting standards, used faulty appraisals that overvalued the mortgaged properties, and accepted untrue information in loan applications.

3.      The Wall Street Bank Defendants were complicit in creating an environment of improper lending practices by the mortgage originators; indeed, in many instances the Wall Street Banks had personnel on site at the mortgage originators to monitor their loan underwriting practices.  The Wall Street Bank Defendants also fostered the environment for, permitted, and profited from the mortgage originators' rampant violations of sound lending practices.  Driven to profit from the lucrative securitization business, the Wall Street Bank Defendants demanded enormous volumes of loans to securitize and sell to investors in the form of RMBS, leading to erosion in lending standards.

1

4.    As a result of the relationships between mortgage originators and the Wall Street Bank Defendants, the Wall Street Banks had superior access to information about the business and lending practices of the mortgage originators and data about the loans, such as loan attributes, beyond what was conveyed to investors in the offering documents for RMBS. Nevertheless, the Wall Street Bank Defendants repeated the untrue information from the mortgage originators in the offering documents used to sell the Securities to investors.

5.    While the Wall Street Banks stated to Plaintiff that they performed careful due diligence into the loans and the mortgage originators' underwriting practices, the Wall Street Banks conducted inadequate due diligence and failed to satisfy their own responsibilities. Thus, the statements of material facts that these Wall Street Banks made to Plaintiff in Massachusetts while offering or selling the Securities were untrue and omitted material information.

6.    In addition, the Wall Street Banks materially aided the Depositor Defendants, who also offered or sold the Securities to the Plaintiff. The Depositor Defendants are Special Purpose Vehicles ("SPVs") that were created as part of the securitization process to acquire and securitize the loans for sale to investors. Working together with the Wall Street Banks, the Depositor Defendants drafted the offering documents that contained the untrue statements of material facts and circulated them to investors.

7.    The Plaintiff brings this action to recover damages incurred as a result of the Defendants' offer or sale of securities in Massachusetts by means of untrue statements of material facts or omissions of material facts in violation of Mass. Gen. Laws Ch. 110A, § 410 (the "Massachusetts Securities Act").

8.    Plaintiff alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief are based on the investigation conducted by and through counsel. The investigation included interviews with confidential witnesses; documents filed in connection with investigations and actions brought by the United States Securities and Exchange Commission (the "SEC"), the Attorneys General of Massachusetts, New York, and California, and private litigants; testimony

before the Federal Financial Crisis Inquiry Commission; a report of a court-appointed bankruptcy trustee; news reports; interviews published in the financial press; Congressional testimony; and other available information. Some of the facts related to Plaintiff's allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## II.   JURISDICTION AND VENUE

9.      Jurisdiction is proper because the offer or sale of the Securities by the Defendants occurred in Massachusetts (see Mass. Gen. Laws Ch. 110A, § 414). In addition, Plaintiff's principal place of business is located in the Commonwealth of Massachusetts, and many of the Defendants have offices in Massachusetts. The amount in controversy exceeds $25,000.

10.     Venue is proper pursuant to Mass. Gen. Laws Ch. 223, § 1 and Superior Court Administrative Directive No. 09-01 because many of the Defendants have usual places of business in Suffolk County.

## III.  THE PARTIES

### a.     **Plaintiff**

11.     Cambridge Place Investment Management Inc. ("CPIM") is a Delaware corporation with its principal place of business in Concord, Massachusetts.

12.     CPIM was responsible for the sourcing, review, analysis, and purchase decisions for U.S. investments for its clients, including Caliber Global Investment Ltd., CAMBER 3 PLC, CAMBER 4 PLC, CAMBER 5 Ltd, CAMBER 7 PLC, CPIM Structured Credit Fund 20 LP, CPIM Structured Credit Fund 500 LP, CPIM Structured Credit Fund 1000 LP, and CPIM Structured Credit Fund 1500 LP (collectively, the "Clients").

13.     CPIM is the exclusive assignee of, and the exclusive attorney-in-fact for and with respect to, all of the Clients' claims relating to the offer and sale of Securities that are the subject of this Complaint. CPIM, as such exclusive assignee and attorney-in-fact of the Clients, is referred to herein as the "Plaintiff."

14.    Plaintiff was solicited in Massachusetts by investment firms, underwriters, and dealers (the "Wall Street Bank Defendants") and by the Depositor Defendants (as defined in ¶ 31), who offered or sold the Securities to Plaintiff.

**b.    The Wall Street Bank Defendants**

15.    **Morgan Stanley & Co., Inc.**:  Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1585 Broadway, New York, New York 10036 and an office located at 1 International Place, Boston, Massachusetts 02110.  The Defendant Morgan Stanley is the broker-dealer subsidiary of Morgan Stanley, a Delaware corporation headquartered in New York, New York.  Defendant Morgan Stanley offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Morgan Stanley sales representatives who offered or sold Securities to Plaintiff included Howard Hennick, Paul Knepple, and Ryan Rossitto.    Morgan Stanley, Knepple, and Rossitto are all licensed to sell securities in Massachusetts.  Other Morgan Stanley representatives who offered or sold Securities to Plaintiff included investment bankers Michael Dubeck, Howard Hubler, Steven Shapiro (who is also licensed to sell securities in Massachusetts), and Terry Smith.   The Securities that Morgan Stanley offered or sold to Plaintiff are listed in Appendix A.

16.    **Citigroup Global Markets, Inc.**:  Defendant Citigroup Global Markets, Inc. ("Citigroup") is a New York corporation and an SEC-registered broker-dealer with its principal place of business located at 388 Greenwich Street, New York, New York.    Citigroup representatives from Citigroup's office located at 2 International Place, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Citigroup sales representatives who offered or sold Securities to Plaintiff included Douglas Meyer, John W. Murray (the manager of Citigroup's Boston office), and David Crean.  Citigroup, Murray, and Crean are all licensed to sell securities in Massachusetts.  Other

4

Citigroup representatives who offered or sold Securities to Plaintiff included investment bankers James Demare, Matthew Cherwin, and Philip Seares (who is also licensed to sell securities in Massachusetts). The Securities that Citigroup offered or sold to Plaintiff are listed in Appendix B.

17.   **Credit Suisse Securities (USA) LLC**: Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 11 Madison Avenue, New York, New York. Credit Suisse representatives from Credit Suisse's office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Credit Suisse sales representatives who offered or sold Securities to Plaintiff included James "Jay" Allen (the manager of Credit Suisse's Boston office) and Andrew Mingle. Credit Suisse, Allen, and Mingle are all licensed to sell securities in Massachusetts. Other Credit Suisse representatives who offered or sold Securities to Plaintiff included syndicate manager Tricia Hazelwood and investment bankers Christopher Schoen, Patrick Dodman, Gregory Richter, and Mark Tecotzky. The Securities that Credit Suisse offered or sold to Plaintiff are listed in Appendix C.

18.   **RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc.**: Defendant RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. ("Greenwich Capital"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 600 Washington Boulevard, Stamford, Connecticut. Greenwich Capital representatives from Greenwich Capital's office located at 28 State Street, Boston, Massachusetts 02109, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Greenwich Capital sales representatives who offered or sold Securities to Plaintiff included Christopher J. Csrnko and Jeffrey Dimodica. Greenwich Capital, Csrnko, and Dimodica are all licensed to sell securities in Massachusetts. Other Greenwich Capital representatives who offered or sold

5

Securities to Plaintiff included investment banker Adam Smith. The Securities that Greenwich Capital offered or sold to Plaintiff are listed in Appendix D.

19. **Deutsche Bank Securities Inc.**: Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 60 Wall Street, New York, New York. Deutsche Bank representatives from Deutsche Bank's office located at 225 Franklin Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Deutsche Bank sales representatives who offered or sold Securities to Plaintiff included Alexandra DaCosta, Christopher Del Col, Laurence Pike, and Chris Walter. Deutsche Bank, DaCosta, Del Col, and Pike are all licensed to sell securities in Massachusetts. Other Deutsche Bank representatives who offered or sold Securities to Plaintiff included syndicate managers Fred Brettschneider (who is also licensed to sell securities in Massachusetts) and Brian Wiele, trader Greg Lippman, and investment bankers Michael Commaroto, Paul Mangione, Joseph Swartz, and Ryan Stark. The Securities that Deutsche Bank offered or sold to Plaintiff are listed in Appendix E.

20. **Merrill Lynch, Pierce, Fenner & Smith, Inc.**: Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York. Merrill Lynch is a wholly owned subsidiary of Merrill Lynch & Co., which became a wholly owned subsidiary of Bank of America Corporation on January 1, 2009. Merrill Lynch representatives from Merrill Lynch's office located at 1 Financial Center, Boston, Massachusetts 02111, offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Merrill Lynch sales representatives who offered or sold Securities to Plaintiff included William Farrell, James Peck, and Greg St. Pierre. Merrill Lynch, Farrell, Peck, and St. Pierre are all licensed to sell securities in Massachusetts. Other Merrill Lynch

6

representatives who offered or sold Securities to Plaintiff included investment bankers Matthew Whalen, Paul Park, and Ketan Parekh. The Securities that Merrill Lynch offered or sold to Plaintiff are listed in Appendix F.

21.     **UBS Securities LLC:** Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at 677 Washington Boulevard, Stamford, Connecticut 06901 and an office located at 1 International Place, Boston, Massachusetts 02110. UBS offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The UBS sales representatives who offered or sold Securities to Plaintiff included Blake Myers. UBS and Myers are licensed to sell securities in Massachusetts. Other UBS representatives who offered or sold Securities to Plaintiff included syndicate managers Jack McCleary and Richard Onkey and investment bankers Jeffrey "Jay" Lown, Carole Mortenson, and Ketan Parekh. The Securities that UBS offered or sold to Plaintiff are listed in Appendix G.

22.     **Goldman, Sachs & Co.:** Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a New York partnership and an SEC-registered broker-dealer with its principal place of business located at 200 West Street, New York, NY 10282. Goldman Sachs maintains an office at 125 High Street, Boston, Massachusetts 02110. Goldman Sachs offered or sold the Securities to Plaintiff in at least one face-to-face meeting and by making telephone calls and sending documents to Plaintiff in Massachusetts. The Goldman Sachs sales representatives who offered or sold Securities to Plaintiff included Michael Cagnassola, Eric Feinstein, Samuel Hancock, and Lorin Radtke. Goldman Sachs, Cagnassola, Feinstein, Hancock, and Radtke are all licensed to sell securities in Massachusetts. Other Goldman Sachs representatives who offered or sold Securities to Plaintiff included investment banker Kevin Gasvoda, who is also licensed to sell securities in Massachusetts. The Securities that Goldman Sachs offered or sold to Plaintiff are listed in Appendix H.

23.  **J.P. Morgan Securities Inc.:**  Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179.  J.P. Morgan is a wholly owned subsidiary of JPMorgan Chase & Co., a financial holding company with its principal place of business located at 270 Park Avenue, New York, New York 10017.  J.P. Morgan maintains an office at 2 International Place, Boston, Massachusetts 02110.  J.P. Morgan offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The J.P. Morgan sales representatives who offered or sold Securities to Plaintiff included James McLaughlin of J.P. Morgan's Boston office.  J.P. Morgan and McLaughlin are both licensed to sell securities in Massachusetts.  Other J.P. Morgan representatives who offered or sold Securities to Plaintiff included syndicate managers Andrew Cherna (who is also licensed to sell securities in Massachusetts) and Brian McDonald.  The Securities that J.P. Morgan offered or sold to Plaintiff are listed in Appendix I.

24.  **J.P. Morgan, successor to Bear Stearns:**  In addition to Plaintiff's claims based on J.P. Morgan's own offers or sales of Securities to Plaintiff, Plaintiff also brings claims against J.P. Morgan as successor-in-interest to Bear Stearns & Co., Inc. ("Bear Stearns"), which was a Delaware corporation and was an SEC-registered broker-dealer with its principal place of business located at 383 Madison Avenue, New York, New York 10179.  On October 1, 2008, J.P. Morgan merged with and into Bear Stearns, with the surviving entity being Defendant J.P. Morgan.  Bear Stearns representatives from Bear Stearns' office located at 1 Federal Street, Boston, Massachusetts 02110, offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts.  The Bear Stearns sales representatives who offered or sold Securities to Plaintiff included Daniel Kenslea, Jr., Felix Moy, Andrew Reese, and Steven Scari.  Bear Stearns was, and Kenslea, Moy, Reese, and Scarri all are, licensed to sell securities in Massachusetts.  Other Bear Stearns representatives who offered or sold Securities to Plaintiff

8

included investment bankers Scott Eichel, Keith Lind, and Chris Scott. Eichel and Lind are also licensed to sell securities in Massachusetts. The Securities that Bear Stearns offered or sold to Plaintiff are listed in Appendix J.

25. **Countrywide Securities Corporation**: Defendant Countrywide Securities Corporation ("Countrywide") is a California corporation with its principal place of business located at 4500 Park Granada, Calabasas, California. Countrywide was an SEC-registered broker-dealer during the relevant period. Countrywide was a subsidiary of Countrywide Financial Corporation, which merged on July 1, 2008 with a wholly owned subsidiary of Bank of America Corporation, making Countrywide an indirect wholly owned subsidiary of Bank of America. Countrywide offered or sold the Securities to Plaintiff in Massachusetts by making telephone calls and sending documents to Plaintiff in Massachusetts. The Countrywide sales representatives who offered or sold Securities to Plaintiff included Matthew Kennedy, who is licensed to sell securities in Massachusetts, and Elaine Pang. The Securities that Countrywide offered or sold to Plaintiff are listed in Appendix K.

26. **FBR Capital Markets & Co., f/k/a/ Friedman, Billings, Ramsey & Co., Inc.**: Defendant FBR Capital Markets & Co., formerly known as Friedman, Billings, Ramsey & Co., Inc. ("FBR"), is a Delaware corporation and an SEC-registered broker-dealer with its principal place of business located at 1001 Nineteenth Street North, Arlington, Virginia 22209. FBR maintains an office at 100 Federal Street, Boston, Massachusetts 02110. FBR offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. The FBR sales representatives who offered or sold Securities to Plaintiff included John Calabrese. Other FBR representatives who offered or sold Securities to Plaintiff included investment bankers Paul Miller and Scott Valentin. FBR, Calabrese, Miller, and Valentin are all licensed to sell securities in Massachusetts. The Securities that FBR offered or sold to Plaintiff are listed in Appendix L.

27. **HSBC Securities (USA), Inc.**: Defendant HSBC Securities (USA), Inc. ("HSBC") is a Delaware corporation and an SEC-registered broker-dealer with its principal place

of business located at 452 Fifth Avenue, New York, New York. HSBC offered or sold the Securities to Plaintiff in Massachusetts by making telephone calls and sending documents to Plaintiff in Massachusetts. The HSBC sales representatives who offered or sold Securities to Plaintiff included Michael Sheldon and Wendy Horn. HSBC and Horn are licensed to sell securities in Massachusetts. Other HSBC representatives who offered or sold Securities to Plaintiff included investment bankers Jon Voigtman, Martin Priest, and Thomas Benz. The Securities that HSBC offered or sold to Plaintiff are listed in Appendix M.

28.     **Banc of America Securities LLC:** Defendant Banc of America Securities LLC ("Banc of America") is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Bryant Park, New York, New York 10036. Banc of America offered or sold the Securities to Plaintiff at face-to-face meetings, including meetings in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. Banc of America's sales representatives who offered or sold Securities to Plaintiff included Thomas Kanes and Kalefe Wright. Banc of America, Kanes, and Wright are all licensed to sell securities in Massachusetts. Other Banc of America representatives who offered or sold Securities to Plaintiff included syndicate manager Patrick Beranek (who is also licensed to sell securities in Massachusetts) and investment bankers Chris Henteman, Paul Jablansky (who is also licensed to sell securities in Massachusetts), and Jeff Willoughby. The Securities that Banc of America offered or sold to Plaintiff are listed in Appendix N.

29.     **Residential Funding Securities, LLC, d/b/a GMAC RFC Securities:** Defendant Residential Funding Securities, LLC, f/k/a Residential Funding Securities Corporation ("GMAC"), is a Delaware limited liability company and an SEC-registered broker-dealer with its principal place of business located at One Meridan Crossings, Richfield, Minnesota 55423. Representatives of GMAC offered or sold the Securities to Plaintiff in at least one meeting in Massachusetts and by making telephone calls and sending documents to Plaintiff in Massachusetts. GMAC sales representatives who offered or sold Securities to Plaintiff

included Robert Djorup and Ted Kallina. The Securities that GMAC offered or sold to Plaintiff are listed in Appendix O.

30.     **Barclays Capital Inc.**:   Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation and an SEC-registered broker-dealer with its principal place of business located at 745 Seventh Avenue, New York, New York 10019, and an office at 125 High Street, Boston, Massachusetts 02110. Barclays offered or sold the Securities to Plaintiff at face-to-face meetings, including at least one meeting in Massachusetts, and by making telephone calls and sending documents to Plaintiff in Massachusetts. Barclays' sales representatives who offered or sold Securities to Plaintiff included James Hurst and Maria Palermo. Barclays and Hurst are licensed to sell securities in Massachusetts. Other Barclays representatives who offered or sold Securities to Plaintiff included investment bankers John Carroll and Paul Menefee. The Securities that Barclays offered or sold to Plaintiff are listed in Appendix P.

c.     **The Depositor Defendants**

31.     To securitize and sell mortgage loans to investors, financial institutions created SPVs to serve various roles in the securitization process. "Depositors" purchased or acquired the mortgage loans, securitized them, and were the "issuers" of the Securities. *See* 17 CFR § 230.191. Working together with the Wall Street Banks, the Depositor Defendants set forth in the table below prepared and circulated the registration statements, accompanying prospectuses, and subsequent prospectus supplements, or private placement memoranda, through which the Depositor Defendants and the Wall Street Bank Defendants offered and sold the Securities and filed the registration statements, prospectuses, and prospectus supplements with the SEC.

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| a | **Accredited Mortgage Loan REIT Trust,** 15253 Avenue of Science, San Diego, CA 92128 (Maryland) | ACCR 2005-3 |

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| b | **Ace Securities Corporation,** 6525 Morrison Blvd., Ste. 318, Charlotte, NC 28211 (Delaware) | ACE 2005-HE2, ACE 2005-HE5, ACE 2005-HE6, ACE 2005-HE7, ACE 2006-FM2, ACE 2006-HE1, ACE 2006-NC1, ACE 2006-NC2, ACE 2006-OP1, ACE 2006-SL1, ACE 2006-SL2, ACE 2007-HE2 |
| c | **Aegis Asset Backed Securities Corporation,** 3250 Briarpark, Ste 400, Houston, TX 77042 (Delaware) | AABST 2005-4, AABST 2005-5 |
| d | **Alliance Securities Corporation,** 1000 Marina Blvd., Ste. 100, Brisbane, CA 94005 (Delaware) | ALBT 2007-S1 |
| e | **American Home Mortgage Assets LLC,** 538 Broadhollow Road, Melville, NY 11747 (Delaware) | AHMA 2007-3 |
| f | **Ameriquest Mortgage Securities Inc.,** 1100 Town & Country Road, Orange, CA 92868 (Delaware) | AMSI 2005-R6, AMSI 2005-R7, AMSI 2005-R8, AMSI 2006-R2 |
| g | **Argent Securities Inc.,** 1100 Town & Country Rd, Orange, CA 92868 (Delaware) | ARSI 2005-W2, ARSI 2005-W3, ARSI 2006-W1, ARSI 2006-W3, ARSI 2006-W5 |
| h | **Asset Backed Funding Corp.,** 214 North Tryon St, Charlotte, NC 28255 (Delaware) | ABFC 2005-HE1, ABFC 2006-OPT2 |
| i | **Asset Backed Securities Corporation,** 11 Madison Ave., New York, NY 10010 (Delaware) | ABSHE 2005-HE1, ABSHE 2005-HE3, ABSHE 2005-HE4, ABSHE 2005-HE5, ABSHE 2006-HE3, ABSHE 2006-HE6, ABSHE 2007-HE7 |
| j | **Banc of America Mortgage Securities, Inc.,** 214 North Tryon St., Charlotte, NC 28255 (Delaware) | BOAA 2006-6 |
| k | **BCAP LLC,** 200 Park Avenue, New York, NY 10166 (Delaware) | BCAP 2006-6, EQLS 2007-1 |

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| l | **Bear Stearns Asset Backed Securities I LLC**, 383 Madison Ave, New York, NY 10179 (Delaware) | AMIT 2005-1, BSABS 2005-AQ2, BSABS 2005-HE10, BSABS 2005-HE4, BSABS 2005-HE8, BSABS 2005-HE9, BSABS 2006-EC1, BSABS 2006-EC2, BSABS 2006-HE1, BSABS 2006-HE10, BSABS 2006-HE3, BSABS 2006-HE4, BSABS 2006-HE7, BSABS 2006-PC1, BSABS 2007-FS1, BSMF 2007-SL2, GPMF 2007-HE1, IRWHE 2005-A, SACO 2005-5, SACO 2005-7, SACO 2005-8, SACO 2005-WM3, SACO 2007-2 |
| m | **Citigroup Mortgage Loan Trust Inc.**, 390 Greenwich Street, Fl 4, New York, NY 10013 (Delaware) | CARR 2005-NC3, CMLTI 2005-9, CMLTI 2005-HE1, CMLTI 2005-HE3, CMLTI 2006-HE1, CMLTI 2006-WFH3, CMLTI 2007-FS1 |
| n | **Credit Suisse First Boston Mortgage Securities Corp.**, 11 Madison Ave., New York, NY 10010 (Delaware) | HEAT 2005-1, HEAT 2005-2, HEAT 2005-3, HEAT 2005-4, HEAT 2005-5, HEAT 2005-6, HEAT 2005-7, HEAT 2005-8, HEAT 2005-9, HEAT 2006-4, HEAT 2006-7, HEMT 2005-5, HEMT 2006-2 |
| o | **CWABS, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWL 2005-11, CWL 2006-17, CWL 2006-18 |
| p | **CWALT, Inc.**, 4500 Park Granada, Calabasas, CA 91302 (Delaware) | CWALT 2005-82, CWALT 2005-J6 |
| q | **FBR Securitization, Inc.**, 1001 Nineteenth St. North, Arlington, VA 22209 (Delaware) | FBRSI 2005-5 |
| r | **Fieldstone Mortgage Investment Corporation**, 11000 Broken Land Parkway, Ste 600, Columbia, MD 21044 (Maryland) | FMIC 2007-1 |
| s | **Financial Asset Securities Corp.**, 600 Steamboat Road, Greenwich, CT 06830 (Delaware) | EMLT 2005-1, FFML 2006-FF8, FHLT 2005-1, MMLT 2005-2, SVHE 2005-1, SVHE 2005-A, SVHE 2005-DO1, SVHE 2006-OPT2, SVHE 2006-OPT5 |
| t | **Fremont Mortgage Securities Corp.**, 2727 East Imperial Highway, Brea, CA 92821 (Delaware) | FHLT 2005-A |
| u | **GS Mortgage Securities Corp.**, 85 Broad St, New York, NY 10004 (Delaware) | GSAMP 2005-HE6, GSAMP 2006-HE6, GSAMP 2006-S1 |

13

| | Depositor Defendant, Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| v | **HSI Asset Securitization Corporation,** 452 Fifth Ave, New York, NY 10018 (Delaware) | FFML 2006-FF5, HASC 2005-NC2, HASC 2006-OPT3 |
| w | **J.P. Morgan Acceptance Corporation I,** 60 Wall Street, New York, NY 10260 (Delaware) | JPMAC 2005-FLD1, JPMAC 2005-OPT1, JPMAC 2005-OPT2, JPMAC 2005-WMC1, JPMAC 2006-CH1, JPMAC 2006-CW2, JPMAC 2006-WMC1 |
| x | **Long Beach Securities Corp.,** 1100 Town & Country Road, Orange, CA 92868 (Delaware) | LBMLT 2005-1, LBMLT 2005-2, LBMLT 2005-WL1, LBMLT 2005-WL2; LBMLT 2006-7, LBMLT 2006-WL1 |
| y | **Merrill Lynch Mortgage Investors, Inc.,** 250 Vesey Street, 4 World Financial Center, 10 Fl. New York, NY 10080 (Delaware) | FFMER 2007-H1; MLMI 2005-AR1, MLMI 2005-NCB, MLMI 2005-SL2, MLMI 2005-SL3, MLMI 2005-WMC1, MLMI 2006-HE4, MLMI 2006-HE5, MLMI 2006-SL1, SURF 2005-BC1 |
| z | **Morgan Stanley ABS Capital I Inc.,** 1585 Broadway, New York, NY 10036 (Delaware) | AMIT 2005-4, IXIS 2005-HE2, IXIS 2005-HE3, IXIS 2005-HE4, IXIS 2006-HE3, MSAC 2005-HE4, MSAC 2005-NC2, MSAC 2005-WMC2, MSAC 2005-WMC3, MSAC 2005-WMC5, MSAC 2005-WMC6, MSAC 2006-HE3, MSAC 2007-HE3, MSHEL 2005-1, MSHEL 2006-1, NTIX 2007-HE2 |
| aa | **Morgan Stanley Capital I Inc.,** 1585 Broadway, New York, NY 10036 (Delaware) | MSAC 2006-HE1 |
| bb | **Mortgage Asset Securitization Transactions, Inc.,** 1285 Ave of the Americas, New York, NY 10019 (Delaware) | FFML 2005-FF7, MABS 2005-FRE1, MABS 2005-NC1, MABS 2006-AM2, MABS 2006-FRE2, MABS 2006-HE1, MABS 2006-NC2, MABS 2006-WMC4 |
| cc | **Nationstar Funding LLC,** 550 Highland Drive, Lewisville, TX 75067 (Delaware) | HELT 2007-FRE1 |
| dd | **New Century Mortgage Securities LLC,** 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-3, NCHET 2005-4, NCHET 2005-D |
| ee | **New Century Mortgage Securities, Inc.,** 18400 Von Karman, Irvine, CA 92612 (Delaware) | NCHET 2005-B, NCHET 2005-C |
| ff | **NovaStar Mortgage Funding Corporation,** 8140 Ward Parkway, Ste. 300, Kansas City, MO 64114 (Delaware) | NHEL 2005-1, NHEL 2005-3 |

14

| | Depositor Defendant. Principal Place of Business (State of Incorporation) | Offerings |
|---|---|---|
| gg | **Park Place Securities, Inc.,** 1100 Town & Country Rd., Orange, CA 92868 (Delaware) | PPSI 2005-WHQ1, PPSI 2005-WHQ3 |
| hh | **People's Choice Home Loan Securities Corp.,** 7515 Irvine Center Drive, Irvine, CA 92618 (Delaware) | PCHLT 2005-2, PCHLT 2005-4 |
| ii | **Popular ABS, Inc.,** 103 Springer Building, 3411 Silverside Road, Wilmington, DE 19810 (Delaware) | POPLR 2005-5 |
| jj | **Residential Accredit Loans, Inc.,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RALI 2006-QS17 |
| kk | **Residential Asset Mortgage Products, Inc.,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RAMP 2005-EFC4, RAMP 2006-RZ3 |
| ll | **Residential Asset Securities Corporation,** 8400 Normandale Lake Boulevard Ste 250, Minneapolis, MN 55437 (Delaware) | RASC 2006-KS2, RASC 2006-KS6, RASC 2006-KS9 |
| mm | **SACO I Inc.,** 383 Madison Avenue, New York, NY 10179 (Delaware) | SACO 2005-1, SACO 2005-2, SACO 2005-3, SACO 2005-4, BSSLT 2007-SV1A |
| nn | **Saxon Asset Securities Company,** 4860 Cox Rd., Ste. 300, Glen Allen, VA 23060 (Virginia) | SAST 2005-2, SAST 2006-3, SAST 2007-2 |
| oo | **Securitized Asset Backed Receivables LLC,** 200 Park Avenue, New York, NY 10166 (Delaware) | SABR 2005-FR4, SABR 2005-FR5, SABR 2006-WM2 |
| pp | **Stanwich Asset Acceptance Company, L.L.C.,** 9 Greenwich Office Park, Greenwich, CT 06831 (Delaware) | CARR 2005-NC4, CARR 2005-NC5, CARR 2006-FRE1, CARR 2006-FRE2, CARR 2006-NC2, CARR 2006-NC4, CARR 2006-RFC1 |
| qq | **Structured Asset Mortgage Investments II Inc.,** 383 Madison Avenue, New York, NY 10179 (Delaware) | SAMI 2005-AR6 |
| rr | **Washington Mutual Mortgage Securities Corp.,** 1201 Third Avenue, WMT 1706, Seattle, WA 98101 (Delaware) | WAMU 2005-AR2 |

32.   The Defendants identified in ¶ 31 are collectively referred to herein as the "Depositor Defendants."

15

## IV.    FACTUAL BACKGROUND

### a.    The Mechanics of Mortgage Securitization

33.    Mortgage pass-through securities represent interests in a pool of mortgages; the securities are shares in the pool that are sold to investors. The securities represent an equity interest in the "issuing trust" that holds the pool. The pass-through securities entitle the holder to payments from the pool of mortgage loans. Although the structure and underlying collateral of the mortgages may vary, the basic principle of pass-through securities remains the same: The cash flow from the pool of mortgages is "passed through" to the securities holders when payments are made by the underlying mortgage borrowers.

34.    The first step in creating a mortgage pass-through security is the acquisition by a "depositor" of an inventory of loans from a "sponsor" or "seller," which either originates the loans or acquires the loans from other mortgage originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed-rate or adjustable-rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to an "issuing trust."

35.    The depositor then securitizes the pool of loans in the issuing trust so that the rights to the cash flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches consist of multiple series of related RMBS offered as part of the same offering, each with a different level of risk and reward. Any losses on the underlying loans - whether due to default, delinquency, or otherwise - are generally applied in reverse order of seniority. As such, the most senior tranches of pass-through securities are rated as the best quality, or "AAA/Aaa." Junior tranches, which usually obtained lower ratings, ranging from "AA/Aa" to "BB/Bb," are less insulated from risk, but offer greater potential returns.

36.    Once the tranches are established, the issuing trust passes the securities back to the depositor, who becomes the issuer of those securities, like the Depositor Defendants herein.

The depositor then passes the securities to one or more Wall Street banks, who offer and sell the securities to investors in exchange for cash that is passed back to the depositor, minus any fees owed to the Wall Street banks.

37.     Wall Street banks play a critical role in the securitization process.   They underwrite the sale of the securities, that is, they purchase the securities from the issuing trust through a depositor and then sell them to investors.   Importantly, the Wall Street banks provide the information that potential investors use to decide whether to purchase the securities.

38.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool.   The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originator develops while making the loans.   For residential mortgage loans, each loan file normally contains documents including the borrower's application for the loan; verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for important measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property.

39.     The collateral pool of loans for each securitization usually includes thousands of loans.   Instead of each potential investor reviewing thousands of loan files, the Wall Street banks that underwrite the sale of the securities in a securitization are responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited into the trust.

   **b.     <u>Securitization of Mortgage Loans: The Traditional Model</u>**

40.     In the 1980s and 1990s, mortgage originators and Wall Street banks fulfilled their respective obligations to comply with underwriting standards and provide accurate information to investors.   The mortgage securitization business, therefore, functioned well, to the benefit of home buyers, financial institutions, and investors.   For the securitization model to work properly,

17

the mortgage originators and the Wall Street banks must perform their roles properly. In particular, it is necessary for the mortgage originators to underwrite loans and appraise properties in accordance with their stated standards and to assure accurate information is obtained from loan applicants. Likewise, it is necessary for the Wall Street banks to perform adequate due diligence into the loan pools and to provide accurate information to investors.

41.     In the traditional mortgage model, a mortgage originator originated loans to borrowers, held the loans to maturity, and therefore retained the credit (default) risk. As such, under the traditional model, the mortgage originator had a financial incentive to ensure that (1) the borrowers had the financial ability to repay the loans, and (2) the underlying properties had sufficient value to enable the mortgage originator to recover its principal and interest if the borrowers defaulted on the loans.

42.     Traditionally, mortgage originators financed their mortgage business primarily using funds from depositors, retained ownership of the mortgage loans they originated, and received a direct benefit from the income flowing from the mortgages. When a mortgage originator held a mortgage through the term of the loan, the mortgage originator received revenue from the borrower's payment of interest and fees. The mortgage originator also bore the risk of loss if the borrower defaulted and the value of the collateral was not sufficient to repay the loan. As a result, the mortgage originator had an economic incentive to verify the borrower's creditworthiness through prudent underwriting and to obtain an accurate appraisal of the value of the underlying property before issuing the mortgage loan.

43.     With the advent of securitization, the traditional "originate to hold" model gave way to the "originate to distribute" model, in which mortgage originators sell the mortgages and transfer credit risk to investors through the issuance and sale of RMBS. Through securitization, mortgage originators no longer hold the mortgage loans to maturity. By selling the mortgages to investors through Wall Street banks, the mortgage originators obtain funds, enabling them to make more loans. Securitization also enables mortgage originators to earn most of their income from transaction and loan-servicing fees, rather than from the spread between interest rates paid

on deposits and interest rates received on mortgage loans as in the traditional model. Thus, securitization gives the mortgage originators an incentive to increase the number of mortgages they issue and reduces their incentive to ensure the mortgages' credit quality. However, the contractual terms of the securitization transactions and good business practices obligate mortgage originators to underwrite loans in accordance with their stated policies and to obtain accurate appraisals of the mortgaged properties.

44.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. During that period, mortgage originators made loans in accordance with their stated underwriting and appraisal standards and provided accurate information about the loans, borrowers, and mortgaged properties to the Wall Street banks that securitized the loans. In turn, the Wall Street banks provided accurate information about the loans, borrowers, and properties to investors in the RMBS. In the 1980s and 1990s, most mortgage securitizations were conducted through the major Government Sponsored Enterprises (the "Agencies"), *i.e.*, the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). The Agencies purchased loans from mortgage originators and securitized the loans. These Agency securitizations had high credit quality because the Agencies required the underlying loans to be originated in accordance with strict underwriting guidelines. Most non-Agency mortgage securitizations during this period also complied with the Agencies' underwriting standards.

c.      **The Systemic Violation of Underwriting and Appraisal Standards in the Mortgage Securitization Industry**

45.     The securitization of mortgage loans fundamentally shifts the risk of loss from the mortgage originator to the investors who purchase RMBS. As discussed in Section IV.b above, traditionally, the mortgage originator had an economic incentive to verify mortgage borrowers' creditworthiness and obtain accurate appraisals of the value of the underlying properties before

issuing mortgage loans because the mortgage originator held the loans to maturity.   In securitizations where the mortgage originator instead sells the loans to Wall Street banks, the mortgage originator does not have the same economic interest in verifying borrowers' creditworthiness or obtaining accurate appraisals in the loan origination process.   Nevertheless, the mortgage securitization process worked well during the 1980s and 1990s because both mortgage originators and Wall Street banks played by the rules and complied with their obligations to underwrite loans responsibly and provide accurate information to investors in RMBS.

46.   Mortgage originators began systematically to violate their stated underwriting and appraisal standards, made loans with little or no documentation, and accepted untrue information from loan applicants.   The mortgage originators also began to provide untrue information about their underwriting practices and about the borrowers, loans, appraisals, and mortgaged properties in connection with the securitization of the loans.   As a result of this pervasive breakdown of compliance with proper practices among the mortgage originators, the Wall Street Banks that securitized mortgages provided Plaintiff with untrue information about the mortgage originators' practices and about the underlying mortgage borrowers, loans, and properties.   The Wall Street Banks also provided Plaintiff with untrue information about their own due diligence of the mortgage originators and underlying loans.

47.   To fund their loans, the mortgage originators maintained credit facilities with warehouse lenders, including the Wall Street Banks.   The Wall Street Banks loaned money to the mortgage originators pursuant to "warehouse agreements," so that the mortgage originators could continue to make loans to home buyers.   The mortgage originators borrowed from these credit facilities to fund their loans, until the loans were sold and the warehouse agreement was repaid. When loans serving as collateral lost value, the Wall Street Banks made margin calls requiring the mortgage originators to pay cash back to the Wall Street Banks.   As a result of the warehouse arrangements between the mortgage originators and the Wall Street Banks, the Wall Street Banks had superior access to information about the mortgage originators' business and lending practices

and the mortgage loans' characteristics and performance, including early warning signs of poor credit quality in loans before the loans were securitized.

48.     Fannie Mae and Freddie Mac provided investors in Agency-sponsored RMBS with protection by guaranteeing that the investors would receive timely payments of principal and interest.  If the borrower for one of the underlying mortgages failed to make scheduled principal or interest payments, the Agency that issued the RMBS would make the payments to the trust.  Because the Agencies were perceived to be backed by the federal government, investors viewed their guarantees as essentially removing the credit risk from Agency-sponsored RMBS.

49.     Between 2001 and 2006, non-Agency loan originations and securitizations increased dramatically, while Agency loan originations and securitizations decreased moderately, as summarized in the following table:

|  | 2001 | 2006 |
|---|---|---|
| **Agency loan originations** | $1.433 trillion | $1.040 trillion |
| **Agency securitizations** | $1.087 trillion | $904 billion |
| **Non-Agency loan originations** | $680 billion | $1.480 trillion |
| **Non-Agency securitizations** | $240 billion (including $87.1 billion of subprime securitizations) | $1.033 trillion (including $448 billion of subprime securitizations) |

Source: *Inside Mortgage Finance* (2007).

50.     Thus, from 2001 to 2006, non-Agency loan originations grew by approximately 115%; non-Agency securitizations grew by approximately 330%; and non-Agency securitizations of subprime loans grew by approximately 415%. According to *Inside Mortgage Finance* (2009), non-Agency RMBS more than trebled in market share between 2003 and 2007, peaking at about 38% of the market in 2006, from 6% in 2003. Another measure of the dramatic growth of the non-Agency RMBS market is that "[t]he amount of all outstanding mortgages held in non-[Agency] MBS rose notably from only $670 billion in 2004 to over $2,000 billion in

2006." Financial Crisis Inquiry Commission ("FCIC"), "Preliminary Staff Report: Securitization and the Mortgage Crisis," April 7, 2010.

51.     Starting in or about 2005, the growth in non-Agency mortgage securitizations was accompanied by widespread violation by the mortgage originators of their stated underwriting and appraisal standards. According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 2008 speech, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis. A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios." The loan-to-value ("LTV") ratio is a significant measure of credit risk, because both the likelihood of default and the severity of loss are higher when borrowers have less equity to protect in the event of foreclosure. The debt-to-income ratio is also a significant measure of credit risk, because borrowers who incur debt that is relatively high compared to their income are more likely to default on their loans. In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original.) As U.S. housing prices subsequently declined, the delinquency rates for such mortgages soared.

52.     An important aspect of the mortgage originators' violation of their stated underwriting standards was their reliance on faulty appraisals. According to the April 7, 2010 FCIC testimony of Richard Bitner, a former executive of a subprime mortgage originator for 15 years and the author of the book *Confessions of a Subprime Lender*, "the appraisal process [was] highly susceptible to manipulation, lenders had to conduct business as though the broker and appraiser couldn't be trusted, [and] either the majority of appraisers were incompetent or they were influenced by brokers to increase the value." He continued:

22

To put things in perspective, during my company's history, half of all the loans we underwrote were overvalued by as much 10%. This meant one out of two appraisals were still within an acceptable tolerance for our end investors. Our experience showed that 10% was the most an appraisal could be overvalued and still be purchased by these investors. Another quarter that we reviewed were overvalued by 11-20%. These loans were either declined or we reduced the property value to an acceptable tolerance level. The remaining 25% of appraisals that we initially underwrote were so overvalued they defied all logic. *Throwing a dart at a board while blindfolded would've produced more accurate results.*[1]

53.    Mr. Bitner testified about the implications of inflated appraisals:

If multiple properties in an area are overvalued by 10%, they become comparable sales for future appraisals. The process then repeats itself. We saw it on several occasions. We'd close a loan in January and see the subject property show up as a comparable sale in the same neighborhood six months later. Except this time, the new subject property, which was nearly identical in size and style to the home we financed in January, was being appraised for 10% more. Of course, demand is a key component to driving value, but the defective nature of the appraisal process served as an accelerant. In the end, the subprime industry's willingness to consistently accept overvalued appraisals significantly contributed to the run-up in property values experienced throughout the country.

\*      \*      \*

If the appraisal process had worked correctly, a significant percentage of subprime borrowers would've been denied due to a lack of funds. Inevitably, this would have forced sellers to drop their exorbitant asking prices to more reasonable levels. The rate of property appreciation experienced on a national basis from 1998 to 2006 was not only a function of market demand, but was due, in part, to the subprime industry's acceptance of overvalued appraisals, coupled with a high percentage of credit-challenged borrowers who financed with no money down.

Mr. Bitner testified that the engine behind the increased malfeasance was the Wall Street Banks: "[T]he demand from Wall Street investment banks to feed the securitization machines coupled with an erosion in credit standards led the industry to drive itself off the proverbial cliff."

54.    Patricia Lindsay, a wholesale underwriter for 10 years at New Century Financial Corporation, testified before the FCIC on April 7, 2010, about the fraudulent practices of New Century's appraisers:

The role and practices of appraisers in subprime mortgage origination:

---

[1] Throughout this Complaint, emphasis in quotations is added except where otherwise noted.

Properly valuing a property . . . is one of the most important components in a loan. In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value. Some appraisers would take boards off boarded up windows, to take the needed photos, then board the properties back up once the shots were taken. Or they would omit certain important elements of a property by angling the camera a certain way or zooming close in to make the property look the best possible. This level of appraiser activism compromises their objectivity.

55.    Alan Hummel, Chair of the Appraisal Institute, testified before the Senate Committee on Banking that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers "experience[d] systemic problems of coercion" and were "ordered to doctor their reports" or they might be "placed on exclusionary or 'do-not-use' lists."

56.    A 2007 survey of 1,200 appraisers conducted by October Research Corp., which publishes *Valuation Review*, found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through. This figure was nearly double the findings of a similar study conducted just three years earlier. The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation." Adding to these problems was the fact that lenders were generally unable to assess the accuracy of the appraisals for loans originated by mortgage brokers, since the lenders were typically located far from the properties and knew little about the properties' neighborhoods.

57.    In addition, the mortgage securitization process was undermined by the widespread industry practice of originating types of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which were made without any

disclosure of the borrower's income or assets; and (3) "No Doc" loans, which were made to borrowers who did not disclose their income, assets, or employment history.

### d.   The Wall Street Banks Conduct Less Due Diligence

58.     As the Wall Street Banks that profited from securitizations sought increasing volumes of mortgage loans from mortgage originators, the mortgage originators gained bargaining power over the terms on which they would sell the loans.  Mortgage originators demanded that the Wall Street Banks limit quality control reviews (*i.e.*, due diligence) to smaller percentages of loans prior to purchase.  Additionally, if a Wall Street Bank chose to "kick out" a large number of loans from a pool – because the loans failed to conform to the mortgage originators' underwriting guidelines or did not contain adequate documentation – the Wall Street Bank risked being excluded from future loan purchases.  As a result, the Wall Street Banks performed increasingly cursory due diligence on the mortgage loans they securitized.  The sheer volume and pace of the securitization business during this period exacerbated such failures.

59.     The Wall Street Banks often acquired large quantities of loans for securitization from "loan auctions."  There, mortgage originators provided the Wall Street Banks with Bid Stipulation Sheets ("Bid Sheets") which stated the times and dates of the auctions and described the general characteristics of the loan pools.  The Bid Sheets also dictated: (1) the percentage of the pool on which the Wall Street Banks would be permitted to conduct due diligence (*e.g.*, 25%); and (2) the number of loans the Wall Street Banks could "kick-out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of requisite legal documentation, and similar deficiencies.  Prior to bid submission, mortgage originators also sent the Wall Street Banks spreadsheets known as "Loan Tapes" which typically contained 50 to 100 columns of data regarding the loans.  The Wall Street Banks were supposed to "crack" the Loan Tapes, analyze them, and determine what prices to bid for the loan pools.  Once this "bid package" analysis was complete, the Wall Street Banks submitted their bids.

60.     If the mortgage originator accepted a bid, the Wall Street Bank typically had a short period of time prior to the settlement date (when cash was paid to the mortgage originator

for the loans) to conduct due diligence on the loans. The Wall Street Banks generally used their own investment bankers to conduct due diligence. Many of the Wall Street Banks also hired third-party due diligence firms such as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this review under the supervision of the Wall Street Banks' investment bankers. Clayton's Form 10-K filed March 14, 2008 specifically identified Wall Street Bank Defendants Morgan Stanley and Deutsche Bank among its clients. Bohan's clients included Bear Stearns (predecessor-in-interest to Wall Street Bank Defendant J.P. Morgan Securities) and Wall Street Bank Defendant Merrill Lynch.

61.   For each loan pool, Clayton and Bohan reviewed the percentage of loans designated in the Bid Sheet to ensure, *inter alia*, that the loans: (1) conformed to the mortgage originators' underwriting guidelines; (2) contained loan data matching the loan data in the Loan Tape; and (3) contained the appropriate mortgage documents. Upon completion of the review, Clayton and Bohan sent the Wall Street Bank a "due diligence report," which it was supposed to use to decide which loans should be "kicked out" of the pool prior to the settlement date. Wall Street Banks, however, were incentivized to kick-out as few loans as possible because, as explained above, (1) mortgage originators would not invite Wall Street Banks that consistently kicked out large numbers of loans to future auctions; and (2) the securitization became smaller as loans were kicked out, thus decreasing the underwriting fee.

62.   As a result, the percentage of loans per pool that Clayton and Bohan were instructed to review declined with time. Frank P. Filipps, Clayton's chairman and CEO, stated that "[e]arly in the decade, a securities firm might have asked Clayton to review 25% to 40% of the sub-prime loans in a pool, compared with typically 10% in 2006." Bohan President Mark Hughes stated, "[b]y contrast, loan buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

63.   In June 2007, New York Attorney General Andrew Cuomo ("NYAG") subpoenaed documents from Clayton and Bohan related to their due diligence efforts. The NYAG's investigation focused on whether Wall Street banks failed to adequately disclose the

warnings they received regarding the number of loans that failed to meet lending guidelines. Clayton also received an information request from the SEC and information subpoenas from the Massachusetts and Connecticut Attorneys General.

64.     On January 12, 2008, in an article entitled "Inquiry Focuses on Withholding of Data on Loans," the *New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans. Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms. ***But the banks did not disclose the details of these reports to credit-rating agencies or investors.*** The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments.

65.     On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in New York in exchange for providing documents and testimony regarding its due diligence reports. That same day, in an article entitled "Loan Reviewer Aiding Inquiry Into Big Banks," the *New York Times* reported that a person familiar with the NYAG's investigation stated that as demand for loans surged, mortgage originators were in a superior bargaining position and required that Wall Street Banks have Clayton and other consultants review fewer loans. Incredibly, "investment banks directed Clayton *to halve the sample of loans it evaluated in each portfolio.*"

66.     On March 17, 2008, in an article entitled "Sub-Prime mortgage watchdogs kept on leash; loan checkers say their warnings of risk were met with indifference," the *Los Angeles Times* reported that Clayton and Bohan employees (including eight former loan reviewers who were interviewed for the article) "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports."

e.     **Plaintiff's Acquisition of the Securities**

67.     Plaintiff, located in Massachusetts, was responsible for the sourcing, review, analysis, and purchase decisions for the U.S. investments for the Clients, and made the decision in Massachusetts to purchase the Securities on behalf of the Clients.   At all relevant times, Plaintiff had numerous employees in Concord, Massachusetts, and Plaintiff continues to have employees in Concord.

68.     Plaintiff decided to purchase each Security on behalf of the Clients on the basis of the information contained in the applicable registration statement, prospectus, and prospectus supplements filed with the SEC or the applicable private placement memorandum (the "Offering Documents"), as identified in Appendices A-P, and based on additional information provided to Plaintiff by the Wall Street Bank Defendants, as described below.   In connection with their offers or sales of the Securities to Plaintiff, the Wall Street Bank Defendants sent to Plaintiff's office in Massachusetts the Offering Documents and additional documents, such as statistical tables to be included in the prospectus supplements.   These documents included term sheets, pooling and servicing agreements, data, computational material, data regarding the LTV and debt-to-income ratios of the pools, computer models of the financial structures of the securitizations, tabular sensitivity data, loan tapes, rating agency expected loss levels, emails, sampling data regarding credit/compliance/appraisal and due diligence, "kickout" criteria and data, and collateral characteristics.   ("Kickout" refers to the mortgage originator's contractual obligation under the terms of the securitization transaction documents to repurchase or replace any mortgage loan that had deficient documentation, an uncured material breach of a representation or warranty, a payment default within a specified time period, or other specified deficiencies.)

69.     These documents contained numerous statements of material facts about the Securities, including statements concerning: (1) the mortgage originators' underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) the LTV ratios,

28

debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were "owner occupied," "second homes," or "investment properties"; (4) the Wall Street Banks' due diligence of the loans and the mortgage originators' underwriting practices; and (5) various forms of credit enhancement applicable to certain tranches of Securities. For example, one form of credit enhancement is overcollateralization, which means that the total principal balance of the mortgage loans in the pool for a securitization (and therefore presumably the total value of the underlying properties) exceeds the aggregate amount of Securities issued and sold in the securitization. Another example of credit enhancement is excess interest, which means that the amount of interest collected on the mortgage loans underlying a securitization for each payment period is expected to be higher than the interest distributable on the Securities and fees and expenses payable by the trust for that period; excess interest may be applied both to absorb any interest shortfalls and to pay principal on the Securities to the extent needed to maintain the required level of overcollateralization.

70.     These statements of material facts were untrue because: (1) the mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers' ability to repay the loans; (2) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (3) the actual numbers of riskier "second home" and "investment property" mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of the mortgage originators' acceptance of untrue information from mortgage applicants. For example, the mortgage originators allowed applicants for "stated income" loans to provide untrue income information and did not verify the applicants' purported income. Stated income loans were therefore widely known among personnel of the mortgage originators as "liar loans."

71.     Often at meetings, including meetings in Massachusetts, the Wall Street Bank Defendants also showed Plaintiff "pitch books" and other materials regarding the credit quality of the Securities and the Wall Street Banks' due diligence of the mortgage originators' underwriting practices. Plaintiff, however, was not allowed to keep the pitch books. These pitch

books and other materials contained untrue statements similar to those described above.   In addition to the untrue statements and omissions in the documents provided or shown to Plaintiff, the Wall Street Bank Defendants made additional untrue oral statements to Plaintiff during face-to-face meetings and by telephone between 2005 and 2007.   The representatives of the Wall Street Bank Defendants who offered or sold the Securities to Plaintiff received compensation based, directly or indirectly, on the volume of Securities they sold to investors, including the Clients on whose behalf Plaintiff purchased Securities.

## V.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACTS AND OMISSIONS ABOUT THE MORTGAGE ORIGINATORS' UNDERWRITING STANDARDS AND PRACTICES

72.   Most of the mortgage loans underlying the Securities purchased by Plaintiff on behalf of the Clients came from the following eight mortgage originators (the "Mortgage Originators"): New Century Mortgage Corp. ("New Century"), Long Beach Mortgage Company ("Long Beach"), Washington Mutual ("WaMu"), Fremont Investment & Loan ("Fremont"), WMC Mortgage Corporation ("WMC"), Argent Mortgage Company ("Argent"), Ameriquest Mortgage ("Ameriquest"), and Option One Mortgage Corporation ("Option One").   Together with Defendant Countrywide, which originated most of its own mortgage loans through its affiliates, these eight Mortgage Originators accounted for approximately 70% of the loans underlying the RMBS purchased by Plaintiff on behalf of the Clients.   The remaining 30% of the loans were originated by approximately 80 other mortgage originators.   On information and belief, the types of violations of underwriting and appraisal standards that are alleged below specifically with respect to each of the eight larger Mortgage Originators were also prevalent among the other, smaller mortgage originators.

73.   All eight of these large Mortgage Originators have now failed, and numerous consumer and securities fraud cases – both private and regulatory – have been lodged against them.   In an April 8, 2010 statement by John C. Dugan, Comptroller of the Currency, before the FCIC, these Mortgage Originators were identified among the "Worst Ten in the Worst Ten," a list of the worst mortgage originators based on the number of foreclosures in the nation's worst ten

metro areas (all except for WaMu, but WaMu's subsidiary Long Beach was on the "Worst Ten" list). During the time that Plaintiff, on the Clients' behalf, was purchasing Securities from the Wall Street Banks that contained mortgage loans provided by these Mortgage Originators, (1) the Mortgage Originators violated their stated underwriting standards when issuing loans to borrowers; (2) the underlying mortgages were based on appraisals that overstated the value of the mortgaged properties and therefore understated the LTV ratios of the mortgage loans; and (3) these underwriting deficiencies rendered the mortgage loans far less valuable and far riskier than disclosed. As a result, the Securities that were issued by the Depositor Defendants and offered or sold by the Wall Street Bank Defendants were backed by mortgage collateral that was much less valuable and posed a significantly greater risk of delinquencies, foreclosures, and other forms of default than the Wall Street Banks stated to Plaintiff.

> a. **New Century Mortgage Corporation**
>
> 1. **Defendants Made Untrue Statements of Material Facts About New Century's Underwriting Standards and Practices**

74. New Century originated Mortgage Loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| CARR 2005-NC4 | Carrington Mortgage Loan Trust | Bear Stearns |
| CARR 2005-NC3 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2005-NC5 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2006-NC2 | Carrington Mortgage Loan Trust | Citigroup |
| CARR 2006-NC4 | Carrington Mortgage Loan Trust | Citigroup |
| ABSHE 2005-HE1 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ABSHE 2005-HE4 | Asset Backed Securities Corp. Home Equity | Credit Suisse |
| ACE 2006-HE1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-NC1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-NC2 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL1 | Ace Securities Corp. | Deutsche Bank |
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| NCHET 2005-4 | New Century Home Equity Loan Trust | Deutsche Bank |

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| IXIS 2005-HE4 | IXIS Real Estate Capital Trust | Morgan Stanley |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |
| HASC 2005-NC2 | HSI Asset Securitization Corporation Trust | HSBC |
| MLMI 2005-NCB | Merrill Lynch Mortgage Investors | Merrill Lynch |
| IXIS 2005-HE2 | IXIS Real Estate Capital Trust | Morgan Stanley |
| IXIS 2005-HE3 | IXIS Real Estate Capital Trust | Morgan Stanley |
| IXIS 2006-HE3 | IXIS Real Estate Capital Trust | Morgan Stanley |
| MSAC 2005-NC2 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2006-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| MSAC 2007-HE3 | Morgan Stanley ABS Capital I | Morgan Stanley |
| NCHET 2005-3 | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-B | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-C | New Century Home Equity Loan Trust | Morgan Stanley |
| NCHET 2005-D | New Century Home Equity Loan Trust | Morgan Stanley |
| NTIX 2007-HE2 | Natixis Real Estate Capital Trust | Morgan Stanley |
| MABS 2005-NC1 | MASTR Asset Backed Securities Trust | UBS |
| MABS 2006-NC2 | MASTR Asset Backed Securities Trust | UBS |

75.   Defendants offered or sold to Plaintiff approximately $286.3 million of Securities for which New Century originated some or all of the underlying mortgage loans.

76.   The Offering Documents for these Securities all contained substantially similar, if not identical, statements of material fact regarding New Century's underwriting standards and practices.   For example, the prospectus supplement for Asset-Backed Securities Corporation Home Equity Loan Trust, ABSHE Series 2005-HE4 stated:

> The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.   All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. *While the originator's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, the originator also*

32

*considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.*

\*      \*      \*

*The mortgage loans will have been originated in accordance with the underwriting guidelines.* On a case-by-case basis, exceptions to the underwriting guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

\*      \*      \*

*Exceptions.* As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. **An exception may be allowed if the application reflects compensating factors, such as:** low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the Mortgage Loans will represent these kinds of exceptions.

77.    The relevant Offering Documents also contained statements of material fact about the information contained in New Century's loan files. For example, the same prospectus supplement stated:

Each applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The underwriting guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments.

78.    The relevant Offering Documents also contained statements of material fact about New Century's appraisal standards and practices. For example, the same prospectus supplement stated:

33

Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. *All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac.* The underwriting guidelines require a review of the appraisal by a qualified employee of the originator or by an appraiser retained by the originator.

79.    These statements are substantially similar, if not identical, to statements concerning New Century's appraisal standards and practices found in the other Prospectus Supplements for the Securities whose underlying mortgage loans were originated by New Century.

80.    The above statements of material facts were untrue when made because, as explained below in ¶¶ 81-95, they failed to disclose that New Century: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties in the loan origination and underwriting process.

### 2.    New Century Violated Its Stated Underwriting Standards

81.    Defendants J.P. Morgan (as successor-in-interest to Bear Stearns), Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Greenwich Capital, HSBC, Merrill Lynch, Morgan Stanley, and UBS offered or sold to Plaintiff Securities containing loans originated by New Century and made untrue statements to Plaintiff about New Century's underwriting and appraisal standards and practices and the loans underlying the Securities. These Wall Street Banks had extensive business relationships with New Century, had access to New Century's mortgage origination personnel and internal information, and conducted due diligence into New Century using their own personnel and third-party loan review firms. As a result of the Wall

34

Street Banks' access to and due diligence into New Century, they were or reasonably should have been aware of the untruth of the statements about New Century described above.

82.     The court-appointed Bankruptcy Examiner issued a detailed report explaining how New Century's "brazen obsession" with loan originations undermined sound underwriting standards. Moreover, New Century's officers are the targets of both a civil class action and a regulatory action brought by the SEC based on their knowledge of and perpetuation of these practices, and allegations of New Century's deficient underwriting practices have been endorsed by several courts. New Century topped the Comptroller of the Currency's list of the "Worst Ten in the Worst Ten," discussed above.

83.     Once one of the nation's largest mortgage origination companies, New Century collapsed and filed for bankruptcy on April 2, 2007. Formed in 1996, New Century grew rapidly to become one of the country's largest subprime lenders, reporting $56.1 billion of total mortgage originations and purchases in 2005 alone. Beginning in 2003, New Century secretly loosened its own underwriting standards and made unjustified exceptions to those already severely weakened standards. These allegations have been substantiated by many sources, as discussed below.

84.     On February 29, 2008, following New Century's bankruptcy, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a detailed report on the various deficiencies at New Century, including lax mortgage origination standards. The Examiner's report detailed "serious loan quality issues at [New Century] beginning as early as 2004"; numerous "red flags" relating to loan quality; and the failure of New Century's senior management and board of directors to devote sufficient attention to improving loan quality until it "was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market."

85.     During the course of his investigation, the Examiner conducted 110 interviews of 85 witnesses and reviewed millions of pages of documents from New Century, its outside auditors, and others. In his 550-page Final Report, the Examiner concluded that:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University." Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." (Examiner's Report, at 3.)

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these 'kick-outs.'" *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. . . ." *Id.* at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid- 2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages." *Id.* at 4.

86.     The Examiner highlighted the severity of New Century's improper conduct: "The Examiner recognizes that the subprime mortgage market collapsed with great speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions. Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged

in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."

87.     According to Confidential Witness ("CW") 1, a former New Century fraud investigator and senior loan underwriter employed from January 1999 until April 2007 and who examined numerous New Century mortgage loans, New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. According to CW 1, New Century, in effect, "stopped underwriting" and adopted an approach that the Company would be "okay if [it] could out run [its] delinquency rate."

88.     According to CW 2, a former New Century Senior Vice President employed from July 2005 until April 2006 in Irvine, California, New Century could only meet its increasing year-over-year sales projections by reducing the underwriting standards. According to CW 2, in his position as Senior Vice President of New Century, he would approve just about any loan under New Century's "weak" underwriting standards.

89.     According to CW 3, a former New Century underwriting unit manager employed from 1998 through October 2006, underwriting standards were loosened in order to increase sales volume. According to CW 3, exceptions to New Century's underwriting standards were "the norm" and employees were told to make loans "work." At one meeting in the late spring of 2006, CW 3 and other underwriters were told by their operations manager that the underwriters had to do what was necessary to increase volume.

90.     Many lenders across the country allowed the sales personnel or account executives at their retail or in-house origination facilities to order and control appraisals and the appraisal process.  According to CW 4, a former New Century underwriter employed by the Company from May 2005 to March 2006 in Itasca, Illinois and, previously, from 2000 until 2003 in Cincinnati, Ohio, as an underwriter for New Century, he could not recall the last loan that he looked at that did not have an exception; he handled close to 200 loans a month; and nearly every loan had an exception such as debt ratio exceptions or loan-to-value exceptions.  According to

CW 4, "the guidelines were thrown against a wall," underwriters were instructed to "dig deep" in order to make loans work, and all decisions were volume driven. According to CW 4, appraisals even if turned down, were often accepted later as branch or regional sales managers "gave them hell" for rejecting appraisals. According to CW 4, he was told by his superiors that New Century was a volume based company and that New Century needed to increase its volume to outrun "shrinkages" in the secondary market.

91.    On May 7, 2007, the front page of the *Washington Post* reported "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans." The *Washington Post* reported that a former New Century appraiser Maggie Hardiman recounted that "[y]ou didn't want to turn away a loan because all hell would break loose," and when she did reject a loan, "her bosses often overruled her and found another appraiser to sign off on it."

92.    On March 12, 2007, *USA Today* reported that, one day after New Century "said its lenders were cutting off financing because it didn't have enough money, or prospects of new assistance, to cover billions of dollars in obligations," New Century disclosed that the SEC was investigating the company. *USA Today* also reported that "New Century also said Tuesday that it has received a grand jury subpoena requesting documents. The request is part of the U.S. Attorney in Los Angeles' criminal probe into the company." On May 1, 2007, the *New York Times* (Today in Business) reported that New Century was facing investigations by both federal prosecutors and securities regulators, and on July 6, 2007, *Reuters* reported that the SEC had elevated its investigation of New Century to "formal status" which "gives the SEC subpoena power."

93.    On December 7, 2009, the SEC charged three of New Century's top officers with violations of the federal securities laws, and claimed that "New Century's business was anything but 'good' and it soon became evident that its lending practices, far from being 'responsible,' were the recipe for financial disaster." SEC Complaint, ¶ 3. The SEC Complaint further details the falsity of New Century's assurances to the market about its "adhere[nce] to high origination standards in order to sell [its] loan products in the secondary market," and its policy to "only

approve subprime loan applications that evidence a borrower's ability to repay the loan." *Id.*, ¶¶ 19-20.

94.     New Century's systematic disregard for its underwriting guidelines led to dramatic downgrades of the value of the Securities in which New Century acted as a mortgage originator. On December 6, 2007, the *New York Times* reported that "[l]oans made by New Century, which filed for bankruptcy protection ..., have some of the highest default rates in the industry. . . , according to data from Moody's Investor Services."

95.     Allegations of New Century's dismal underwriting have been sustained by Courts in similar actions.   For example, in *New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*, an investor brought class claims against the dealer, issuer, and underwriter of RMBS containing collateral loans underwritten by New Century, alleging that New Century failed to comply with its "loan-approval oversight and control mechanisms as represented in [its] underwriting guidelines."   The court substantially denied defendants' motion to dismiss, holding that the complaint properly alleged "systemic borrower defaults, complete lack of controls and oversight, and flagrant violations of the Guidelines," and that New Century, along with the dealer and issuer defendants, "acted with reckless abandon in their zeal to generate loan volume and profits."

     **b.**     **Long Beach Mortgage Company**

          **1.**     **Defendants Made Untrue Statements of Material Facts About Long Beach's Underwriting Standards and Practices**

96.     Long Beach Mortgage Company ("Long Beach") originated mortgage loans that were included in the pools for the following offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| ACE 2006-SL2 | Ace Securities Corp. | Deutsche Bank |
| GSAMP 2006-S1 | GS Mortgage Securities Corp. | Goldman Sachs |
| LBMLT 2005-1 | Long Beach Mortgage Loan Trust | Greenwich Capital |
| LBMLT 2005-2 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| LBMLT 2005-WL1 | Long Beach Mortgage Loan Trust | Greenwich Capital |
| LBMLT 2005-WL2 | Long Beach Mortgage Loan Trust | Credit Suisse |

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| LBMLT 2006-7 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| LBMLT 2006-WL1 | Long Beach Mortgage Loan Trust | Goldman Sachs |
| SVHE 2005-B | SoundView Home Loan Trust | Greenwich Capital |

97.     Defendants offered or sold to Plaintiff approximately $123.0 million of Securities for which Long Beach originated some or all of the underlying mortgage loans.

98.     The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding Long Beach's underwriting standards and practices. For example, prospectus supplement ACE 2006-SL2 stated:

> All of the mortgage loans owned by the trust that have been originated by Long Beach, have been originated by Long Beach through wholesale brokers or re-underwritten upon acquisition from correspondents by Long Beach generally in accordance with Long Beach's underwriting guidelines described in this section. Long Beach's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.
>
> *     *     *
>
> The adequacy of the mortgaged property as collateral is generally determined by an appraisal of the mortgaged property that generally conforms to Fannie Mae and Freddie Mac appraisal standards and a review of that appraisal. The mortgaged properties are appraised by licensed independent appraisers who have satisfied the servicer's appraiser screening process.
>
> *     *     *
>
> On a case-by-case basis and only with the approval of an employee with appropriate risk level authority, Long Beach may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its underwriting risk category guidelines warrants an underwriting exception.

99.     The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 100-127, they failed to disclose that Long Beach: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in

many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

### 2.   Long Beach Violated Its Stated Underwriting Standards

100.   Defendants Credit Suisse, Deutsche Bank, Goldman Sachs, and Greenwich Capital offered or sold to Plaintiff Securities containing loans originated by Long Beach and made untrue statements to Plaintiff about Long Beach's underwriting and appraisal standards and practices and the loans underlying the Securities.   These Wall Street Banks had extensive business relationships with Long Beach, had access to Long Beach's mortgage origination personnel and internal information, and conducted due diligence into Long Beach using their own personnel and third-party loan review firms.   As a result of the Wall Street Banks' access to and due diligence into Long Beach, they were or reasonably should have been aware of the untruth of the statements about Long Beach described above.

101.   In 1999, Long Beach was acquired by WaMu, a Washington corporation headquartered at 1301 Second Avenue, Seattle, Washington 98101.   WaMu was founded in 1889 and, before its bankruptcy, was the largest savings and loan association in the country.   Long Beach served as WaMu's subprime loan origination division until January 1, 2006 and was thereafter known as WaMu's "specialty mortgage lending" channel.   According to CW 5, who served as a Long Beach Senior Underwriter in the Chicago area from 2004 through September 2007, WaMu sold subprime loans with interest-only and negative-amortization features, increasing the riskiness of these loans.

102.   The Senate Permanent Subcommittee on Investigations ("PSI"), after investigating and holding hearings on Long Beach's role in the recent financial crisis, concluded the following about the company:

> Subprime lending can be a responsible business.   Most subprime borrowers pay their loans on time and in full.   Long Beach, however, was not a responsible lender.   Its loans and mortgage backed securities were among the worst performing in the subprime industry.

103. Long Beach financially rewarded its employees for closing higher-risk loans and instituted loan sales quotas. Long Beach loan officers, for example, received more money per loan for originating higher-risk loans and for exceeding established loan targets. Loan processing personnel were compensated according to the speed and number of the loans they processed. Loan officers and their sales associates received still more compensation if they charged borrowers higher interest rates or points than required in bank rate sheets specifying loan prices, or included prepayment penalties in the loan agreements. That added compensation created incentives to increase loan profitability, but not loan quality. Accordingly, Long Beach's employees targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to meet the obligations incident to the loans they were sold.

104. According to CW 6, a First Vice President in the Capital Markets Group and Director of Investor Relations at WaMu Capital Corp. in New York, New York, from October 2004 until December 2007, Long Beach compensated its account executives and underwriters based on the volume of loans that they brought in and closed, and their compensation structure gave no consideration to the quality of those loans.

105. CW 7, an Account Executive for Long Beach in New Jersey from 1998 until October 2007, noted a shift in underwriting philosophy in 2005 toward increasing loan volume at all costs. When CW 7 first joined the subprime business, Long Beach relied on "common sense underwriting" and was not exclusively focused on credit scores. CW 7 noted the change away from a "know your borrower" focus beginning in the 2005 timeframe, with Long Beach relying more on credit scores and less on common sense. The borrower needed to produce less and less documentation, and Fair Isaac Credit Organization ("FICO") credit scores became more important than verifying income for Long Beach. In response, "volume really went through the roof."

106. Long Beach pushed through every loan it could close, through whatever means necessary. CW 8, a Senior Underwriter for Long Beach in Dallas, Texas, from 2004 through

April 2007, reported that on occasion CW 8 would express concerns to her manager over funding some of the loans underwritten, but the manager's "direction from corporate" was simply to fund loans. CW 8 also reported that at month-end team meetings, it was often discussed that the Company was trying to increase volume by getting more "borrowers to fit."

107.   CW 8 recalled that some of the "crazier" programs at Long Beach included stated-income loans for W-2 wage earners, a program that started in 2005. Stated-income programs, to the extent that lenders accepted them, were traditionally reserved for self-employed borrowers with significant assets. At Long Beach, however, these "liar's loans" were common, even for those borrowers who were not self-employed. Long Beach would also approve 100% financing for stated-income borrowers with FICO scores as low as 500.

108.   CW 8 also described a "three letters of reference" program for self-employed borrowers, where a borrower only had to submit three letters of reference from anyone for whom they supposedly worked. CW 8 said no attempt was made to verify the information in the letters. CW 8 related that some of the accepted letters included statements such as: "So-and-so cuts my lawn and does a good job." At Long Beach, FICO scores ranged from 500-620, but CW 8 said that if Long Beach salespeople had a borrower with a 620, they were "hooping and hollering" about having a borrower with good credit.

109.   CW 8 also relayed that borrowers could get a loan with no established FICO score merely by providing "three alternative trade lines." An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent payment, or a note from a person claiming the borrower had repaid a personal debt. CW 8 said that Long Beach originated "a significant amount" of these types of problematic loans. CW 8 commented: "It was just a disaster." Furthermore, CW 8 said that these loans made up the majority of first payment defaults – i.e., loans on which the borrower failed to make even the first payment – in the end of 2006.

110.   CW 9 was a Wholesale Mortgage Underwriter at the Long Beach loan processing center located in Lake Oswego, Oregon from August 2005 until December 2006. CW 9 first

joined WaMu in Lake Oswego in 2003 as a Senior Credit Analyst and subsequently joined Long Beach in 2004 as a Senior Loan Coordinator, ultimately becoming a Wholesale Mortgage Underwriter. CW 9 said that at Long Beach there was always a sense of "working the underwriting guidelines" to close loans, rather than to mitigate Long Beach's credit risk. CW 9 said that there was simply an environment in the loan processing center to "approve, approve, approve" and that any exception that was needed to approve a loan was not only done, but was "sought after." CW 9 felt that Long Beach consistently pressured its underwriters to "find a way to make it work."

111.   According to CW 5, even the few loans that Long Beach underwriters refused to approve were regularly pushed through by Long Beach management by granting exceptions to the guidelines. According to CW 5, "There were so many exceptions." Long Beach allowed LTV ratio exceptions, and the "rate exceptions were ridiculous." According to CW 5, WaMu allowed even the salespeople to give interest-rate exceptions to borrowers to push loans through. CW 5 explained: "There were really no restrictions to approve a loan," and some "really bad loans" went through the office. The attitude at WaMu was "push, push, push."

112.   Numerous other Long Beach employees agreed that exceptions to Long Beach's guidelines were commonplace. CW 10, a Senior Underwriter with WaMu in Livermore, California from 2003 through September 2007, said that if Long Beach's competitors could not approve a loan, it was known to send the loan to Long Beach and they would make an exception to get the loan through. CW 10 said that guidelines were "loose to the point of disbelief." CW 10 described Long Beach's lending approach as follows: "If [potential borrowers] were breathing and had a heart beat, you could probably get the loan done."

113.   CW 9 stated that many employees at Long Beach were disappointed about the decisions that were being made about loan quality, but they were resigned to simply "keep their heads down." According to CW 5, several WaMu employees contacted corporate headquarters about the incessant underwriting exceptions, including issuing loans to unqualified borrowers. CW 5 stated, "[w]e did a lot of underhanded stuff." CW 5 stated that if an underwriter at Long

Beach refused to force a file through, they would be written up, not because they made a bad decision but because the sales team did not like their decision. CW 5 said: "Basically, sales is what ran Long Beach Mortgage, it wasn't the Operations part."

114.   CW 11 served as a Quality Assurance Manager in the Long Beach Loan Fulfillment Center ("LFC") in Dallas, Texas from November 2005 until his termination in August 2007. CW 11 explained that the Quality Assurance group in Dallas performed a monthly audit on a random selection of subprime loans from the various loan origination centers around the country. This analysis was not focused on loan-specific issues, but instead concerned WaMu/Long Beach-wide trends that might suggest necessary changes in underwriting guidelines, compliance standards, or other systems.

115.   CW 11 observed that, despite the extensive analysis that the group performed to determine the causes for WaMu/Long Beach-wide loan problems, WaMu/Long Beach ignored the results. CW 11's group continued to identify the same problematic trends again and again without WaMu/Long Beach taking any steps to address the causes. According to CW 11, although WaMu/Long Beach was "going through the motions" to present a façade of legitimate quality control, in reality there was nothing but a "free for all to approve loans by the thousands."

116.   According to CW 12, an employee of Long Beach from 2001 until October 2006, serving as an underwriter and later becoming a Quality Assurance Manager, a group of WaMu employees regularly reviewed a percentage (typically around 20%) of Long Beach's loans to monitor Long Beach's underwriting. CW 12 forwarded the report to Long Beach's Loan Servicing Center managers. The Long Beach managers receiving the reports had a certain number of days to go through the loan files in question and respond to the findings in the reports.

117.   According to CW 13, a Senior Default Foreclosure Loan Specialist with Long Beach in Chatsworth, California from 2002 to September 2006, her department received statistics every month that showed the number of first payment defaults from the prior month. According to CW 13, at the end of 2004, the default numbers were at 6-7% and, "although they may have increased slightly, did not go over 9%." Suddenly, however, they increased "all at

45

once" to as high as 14%. According to CW 13, first payment defaults just "seemed to go up and up."

118.   In his opening statement at the first PSI hearing on Wall Street and the Financial Crisis (related to the role of high risk home loans), Senator Carl Levin noted that an internal WaMu audit of Long Beach in 2005 found that "relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool" led to deteriorating loans.  Many of the loans defaulted within three months of being sold to investors.  Investors demanded that Long Beach repurchase them.  Long Beach had to repurchase over $875 million in loans in 2005 and 2006, lost over $107 million from the defaults, and had to cover a $75 million shortfall in its repurchase reserves.

119.   Senator Levin also noted that in response to the repurchase requests, WaMu "fired Long Beach's senior management and moved the company under the direct supervision of the President of WaMu's Home Loans Division, David Schneider" and that "WaMu promised its regulator that Long Beach would improve.  But it didn't."  In April 2006, WaMu's President, Steve Rotella, emailed the CEO, Kerry Killinger, that Long Beach's "delinquencies are up 140% and foreclosures close to 70%. . . .  It is ugly."  Five months later, in September, he emailed that Long Beach is "terrible. . . .  Repurchases, [early payment defaults], manual underwriting, very weak servicing/collections practices and a weak staff."  Two months after that, in November 2006, the head of WaMu Capital Markets in New York, David Beck, wrote to Mr. Schneider that "LBMC [Long Beach] paper is among the worst performing in the [market]."

120.   In June 2007, WaMu shut down Long Beach and took over its subprime lending operations.  Currently, Long Beach mortgage backed securities report loan delinquency rates in excess of 40%.  At the end of 2007, a Long Beach employee was indicted for having taken kickbacks to process fraudulent or substandard loans.

121.   In April 2010, the Senate Permanent Subcommittee on Investigations ("PSI") held a series of hearings "to examine some of the causes and consequences of the crisis."  The goals

of the hearings were threefold: (1) to construct a public record of the facts to deepen public understanding of what happened and to try to hold some of the perpetrators accountable; (2) to inform the legislative debate about the need for financial reform; and (3) to provide a foundation for building better defenses to protect Main Street from the excesses of Wall Street.

122.    The hearings were based on an in-depth bipartisan investigation that began in November 2008.  The PSI conducted over 100 detailed interviews and depositions, consulted with dozens of experts, and collected and reviewed millions of pages of documents.  Given the extent of the economic damage and the complexity of its root causes, the Subcommittee's approach has been to develop detailed case studies to examine each stage of the crisis.

123.    On April 13, 2010, the PSI held a hearing that focused on the role high risk loans played in the financial crisis, using WaMu as a case history.  It showed how WaMu originated and sold hundreds of billions of dollars in high risk loans to Wall Street Banks in return for big fees, polluting the financial system with toxic mortgages.

124.    The PSI reached the following findings of fact following the April 13, 2010 hearing:

> **1.    High Risk Lending Strategy.**  Washington Mutual ("WaMu") executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.
>
> **2.    Shoddy Lending Practices.**  WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.
>
> **3.    Steering Borrowers to High Risk Loans.**  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.
>
> **4.    Polluting the Financial System.**  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and

*polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.*

**5.    Securitizing Delinquency-Prone and Fraudulent Loans**.  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

**6.    Destructive Compensation**.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.

125.    The PSI also concluded that "from 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system."

126.    Long Beach and WaMu's appraisal practices have also been the target of governmental investigations.  On November 1, 2007, New York State Attorney General Andrew Cuomo announced that he was suing eAppraiseIT and its parent company First American Corporation, charging them with caving into pressure from WaMu to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. *People of the State of New York v. First Am. Corp. and First Am. eAppraiseIT*, Index No. 406796/2007 (N.Y. Sup. Ct.).  Cuomo's suit alleged that eAppraiseIT colluded with WaMu (the parent of Mortgage Originator Long Beach) to inflate the appraisal values of homes.  According to Cuomo, between April 2006 and October 2007, First American performed 262,000 appraisals for WaMu.  When WaMu loan officers began complaining that valuations by eAppraiseIT's independent roster were coming in too low, WaMu allegedly pressured First American to assign only appraisers on WaMu's approved list when appraising WaMu mortgage-related properties.  WaMu allegedly threatened to take its business elsewhere, and dangled the prospect of greater use of First American's other

settlement services, to convince eAppraiseIT to accede to its demands. In a press release that accompanied the suit, Cuomo stated:

> The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to ripoff homeowners and investors alike . . . . The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion.

127.    On June 8, 2010, the New York State Appellate Division, First Department, issued a decision upholding Attorney General Cuomo's complaint.

c.    **WaMu**

1.    **Defendants Made Untrue Statements of Material Facts About WaMu's Underwriting Standards and Practices**

128.    In addition to the loan originations by WaMu's Long Beach subsidiary discussed above, WaMu originated mortgage loans that were included in the pools for the following Offerings:

| Offering | Depositor Defendant | Wall Street Bank Defendant |
|---|---|---|
| SACO 2005-WM3 | SACO I Trust | Bear Stearns |
| WAMU 2005-AR2 | Washington Mutual | Greenwich Capital |

129.    Defendants offered or sold to Plaintiff approximately $25.6 million of Securities for which WaMu originated some or all of the underlying mortgage loans.

130.    The Offering Documents all contained substantially similar, if not identical, statements of material facts regarding WaMu's underwriting standards and practices.    For example, prospectus supplement WAMU 2005-AR2 stated:

> [WaMu]'s underwriting standards are intended to evaluate the prospective Mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed Mortgaged Property as collateral.    In the loan application process, prospective Mortgagors will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items.    Each prospective Mortgagor will also provide an authorization to apply for a credit report which summarizes the Mortgagor's credit history.    With respect to establishing the prospective Mortgagor's ability to

make timely payments, the Company will require evidence regarding the Mortgagor's employment and income, and of the amount of deposits made to financial institutions where the Mortgagor maintains demand or savings accounts. In some instances, Mortgage Loans which were originated under a Limited Documentation Origination Program may be sold to the Company. For a mortgage loan originated under a Limited Documentation Origination Program to qualify for purchase by the Company, the prospective mortgagor must have a good credit history and be financially capable of making a larger cash down payment, in a purchase, or be willing to finance less of the appraised value, in a refinancing, than would otherwise be required by the Company. Currently, the Company's underwriting standards provide that only mortgage loans with certain loan-to-value ratios will qualify for purchase. If the mortgage loan qualifies, the Company waives some of its documentation requirements and eliminates verification of income and employment for the prospective mortgagor.

The Company's underwriting standards generally follow guidelines acceptable to Fannie Mae and Freddie Mac. In determining the adequacy of the property as collateral, an independent appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed. The appraisal is based on the appraiser's judgment of values, giving appropriate weight to both the market value of comparable homes and the cost of replacing the property.

131.    The above statements of material facts were untrue when made because, as demonstrated below in ¶¶ 132-158, they failed to disclose that WaMu: (i) systematically failed to follow its stated underwriting standards; (ii) allowed pervasive exceptions to its stated underwriting standards in the absence of compensating factors; (iii) disregarded credit quality in favor of generating increased loan volume; and (iv) violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgage properties in the loan origination and underwriting process.

## 2.    WaMu Violated Its Stated Underwriting Standards

132.    J.P. Morgan (as successor-in-interest to Bear Stearns) and Greenwich Capital offered or sold to Plaintiff Securities containing loans originated by WaMu and made untrue statements to Plaintiff about WaMu's underwriting and appraisal standards and practices and the loans underlying the Securities. These Wall Street Banks had extensive business relationships with WaMu, had access to WaMu's mortgage origination personnel and internal information, and conducted due diligence into WaMu using their own personnel and third-party loan review firms.

As a result of the Wall Street Banks' access to and due diligence into WaMu, they were or reasonably should have been aware of the untruth of the statements about WaMu described above.

133.    In addition to the facts alleged above regarding improper underwriting and appraisal practices by Long Beach, WaMu's subprime mortgage subsidiary, WaMu also pervasively violated its stated underwriting and appraisal standards in its purportedly prime mortgage business.    In order to generate a greater volume of risky loan products, WaMu financially rewarded loan origination personnel for closing higher-risk loans and instituted minimum loan sales quotas. Accordingly, WaMu's employees targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to make payments on the loans they were sold.

134.    CW 14, a WaMu Vice President and Senior Credit Quality Manager from 2005 until February 2008 and a Senior Credit Risk Manager from April 2004 through March 2005, explained with regard to WaMu's loans, "[t]he more you slammed out, the more you made." Similarly, CW 15, a Senior Loan Consultant with WaMu from 2005 to 2007, observed that sometimes mortgage originators were surprised by the loans they could get approved.  However, as a loan officer, if CW 15 could personally earn $2,000 - $3,000 by closing a loan, then CW 15's only concern was getting the loan approved. According to CW 15: "Once you get paid, you don't care what happens." CW 16, a Senior Loan Coordinator for WaMu's Home Loan Center in Bethel Park, Pennsylvania from February 1998 until September 2007, felt that WaMu employees were "greedy" and that the borrowers suffered as a result.  CW 16 concluded, "[w]e could never figure it out why people came to us [for loans]."

135.    In a November 2, 2008 *New York Times* article titled "Was There a Loan It Didn't Like?," former WaMu Senior Mortgage Underwriter Keysha Cooper, who started at WaMu in 2003 and left in 2007, explained that "*[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify.* Instead, it was how many loans did you guys close and fund?" According to the article, "[i]n

February 2007, . . . the pressure became intense. WaMu executives told employees they were not making enough loans and had to get their numbers up . . . ." Ms. Cooper concluded, "I swear 60 percent of the loans I approved I was made to. . . . If I could get everyone's name, I would write them apology letters."

136.  Other former employees agreed that the primary factor driving WaMu's mortgage lending practices was to produce as much volume as possible.  CW 17, who was a Closing Loan Coordinator at WaMu in Bethel Park, Pennsylvania, from 2003 until July 2007, explained that WaMu's priority regarding loans was "always quantity rather than quality," and her branch closed an "insane" number of loans every day.  WaMu loan personnel could meet these volume expectations only because "[i]f you flew by the seat of your pants and didn't look at everything, you could get it done."  CW 17 observed that the branch goal was "hitting certain numbers every month."  WaMu rewarded high-performing loan officers with "fabulous vacations" if they made their numbers.  CW 17 noted, "It was all about sell, sell, sell."

137.  Similarly, according to CW 18, a Loan Coordinator/Mortgage Processor for WaMu in Jacksonville, Florida from March 2007 until December 2007, there was a company-wide culture that required WaMu employees to do "whatever it took to get loans closed."  WaMu managers would constantly press WaMu underwriters and salespeople to "push, push, push" to close loans.  CW 16 stated that "*WaMu's top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it . . . . Everybody just wanted their chunk of the money*."  Not only did loan coordinators receive bonuses for loans they closed, but also CW 16 understood that if loan officers did not meet their quotas, WaMu fired them.

138.  Mortgage originators were also paid more for originating loans that carried higher profit margins for WaMu and had commensurately higher credit risk.  For example, CW 19, a Senior Loan Consultant with WaMu at Riverside, California, from 2005 through December 2007, reported that "every year [WaMu] came out with a new commission outline and [WaMu's] extra commissions for teaser rate loans."  Further, according to CW 19, occasionally WaMu would

send out emails to mortgage originators about commission "specials." One of WaMu's "specials," CW 19 recalls, was to give mortgage originators extra commissions for Option ARM loans. In addition, *WaMu paid additional commissions for non-conforming loans*. According to CW 19, at WaMu "[i]t's not about what's best for the client; it's about what's best for the Company." According to CW 20, a Sales Manager with WaMu for twenty years until October 2006, WaMu managers also received increases in their bonuses if their group closed a certain percentage of Option ARM loans.

139.   CW 21, a former Loan Consultant for WaMu in Riverside, California, reported that because of WaMu's additional incentive compensation, WaMu salespeople undertook particularly aggressive tactics to sell Option ARM loans. As CW 22, who served as a Senior Underwriter with WaMu through a private mortgage insurance company, put it, "WaMu's biggest things are ARMs – they push those things like cotton candy." According to CW 21, "most borrowers" who came to WaMu "wanted the fixed rate loans." Thus, selling Option ARM loans required "pushing" them, which was done in a "nasty" way. *WaMu loan officers would fail to educate the borrower, so that Option ARM loan borrowers "would think they were paying the fully-indexed rate, when they were only paying a portion of the interest" because the loan consultants did not explain the programs thoroughly*. WaMu loan consultants were under "a lot of pressure" from their managers to promote and sell Option ARM loans. CW 21 originated only "one or two" Option ARM loans because CW 21 was so morally opposed to these "risky" loans. As a result, CW 21 was frequently reprimanded by CW 21's managers at WaMu.

140.   CW 23 was an employee at WaMu from 1993 to 2006 and was a "Senior Trainer" from 2000-2004, training employees on processing, closing, underwriting, leadership, products, and pricing. According to CW 23, Option ARM loans were suitable only for rental, non-owner occupied properties or for "savvy investment people who play the stock market." However, many of the WaMu sales people in CW 23's class did not understand the concept of negative amortization and could not explain it to borrowers.

141.   Indeed, an internal WaMu presentation on Option ARM loans shows that WaMu focused on unsophisticated borrowers for its high-risk Option ARM loans.  The internal WaMu presentation states that appropriate "Option ARM Candidates" are:

- Savvy Investors
- *First Time Home Buyers*
- High Income Earners
- *Self Employed Borrowers*
- *Retired Borrowers*
- Real Estate Agents

The next page of the same presentation further explained that WaMu's target borrowers were of:

- *All Ages*
- *Any Social Status*
- *All Economic Levels*

In other words, WaMu pushed its Option ARM loans on borrowers regardless of their sophistication, income level, or financial stability.

142.   WaMu financially incentivized its underwriters, who supposedly served as WaMu's "gatekeepers" of loan credit quality, to approve an enormous volume of loans without regard to loan quality.

143.   CW 24, a Senior Underwriter with WaMu in Livermore, California, from 2003 through September 2007, confirmed that loan underwriters received commissions based upon volume of loans underwritten and closed.  CW 6 confirmed that underwriters were compensated on the volume of loans brought in and closed, with no consideration given to the quality of the loans.

144.   According to CW 14, underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments.  Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses; some underwriters received monthly bonus payments of $5,000 for underwriting a high volume of loans.

145.   Notwithstanding underwriters' exorbitant volume-based bonuses, according to CW 25, who worked at WaMu from 1997 to February 2008 and served as a Credit Quality Manager and an Area Underwriting Manager, WaMu's senior management believed that if underwriters knew about underwriting problems that led to problem loans, WaMu's underwriters would "by nature" have tightened up WaMu's lending standards.   Thus, WaMu refused to provide loan delinquency data to its underwriters.

146.   Highly experienced mortgage underwriters who worked at WaMu during the relevant period were shocked by how lenient WaMu was in its lending.   CW 26 was a Senior Underwriter in the Washington Mutual Wholesale loan fulfillment center in Lake Success, New York, from June 2005 through February 2008.   CW 26 had twenty-plus years of experience underwriting home loans.   When CW 26 arrived at WaMu, CW 26 was stunned to find that WaMu's supposedly "A paper" (*i.e.*, prime loans) consisted of loans made to borrowers with credit scores in the 500s, high LTV ratios, and Option ARM loans.   CW 26 reported that there was "only so much you could do" with the loans she underwrote, because they met WaMu's lenient underwriting guidelines and CW 26 did not want to discriminate among borrowers by denying loans to some borrowers who met WaMu's loose guidelines merely because CW 26 did not think that borrower could actually repay the loan that WaMu had sold.

147.   Similarly, CW 27, who served as a Senior Underwriter with WaMu through a private mortgage insurance company for most of 2007, was appalled by the lenient standards in place at WaMu.   CW 27 reported that WaMu's reputation in the mortgage industry was that "if you had a pulse, WaMu would give you a loan."   CW 27 stated that the underwriting guidelines at WaMu "changed every minute. . . .   You would literally be getting an email every second that the guidelines changed or would have a pissed off account executive at your desk asking why the loan can't go through."   Often, CW 27 reported, loans would be taken away from her to be approved by another underwriter who was not as conscientious.   CW 27 often saw active or approved loans in the system that CW 27 had refused to underwrite and were ultimately signed