UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CAMBRIDGE PLACE INVESTMENT MANAGEMENT, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 10-11376-NMG |
| MORGAN STANLEY & CO., INC., et al., | ) ) ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION TO TAKE JURISDICTIONAL DISCOVERY**

December 28, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

This matter is before the court on the defendants' joint motion to take jurisdic-

tional discovery in support of their contention that this court has diversity jurisdiction

over the pending action.  (Docket No. 158).[1]  By their motion, the defendants are seeking

leave to take discovery concerning the terms of and circumstances surrounding the

assignments that the plaintiff, Cambridge Place Investment Management, Inc. ("CPIM"),

---

[1]  A motion to take discovery is a non-dispositive motion which a Magistrate Judge may "hear and decide" pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(A).  However, since this motion requires the court to decide whether there is the possibility of diversity jurisdiction in this court, and this decision is critical to the court's ruling on plaintiff's motion to remand this matter to state court, I have elected to issue this decision as a Report and Recommendation pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)(B).  This way, the District Judge can consider all relevant matters together if the remand issue is reviewed.

received from nine hedge funds, "the precise citizenship of the foreign hedge funds, and the identity of which foreign hedge fund purchased which individual security with what involvement (if any) by CPIM." Defendants' Memorandum in Support of Their Joint Motion (Docket No. 159) ("Defs.' Mem.") at 11. It is the defendants' contention that CPIM, a Delaware corporation, is not the appropriate plaintiff in this action and that the citizenship of the assignor hedge funds controls on the issue of diversity. CPIM objects to the motion first, because it claims that it is the proper plaintiff and, therefore, there is no diversity, and, second, because it claims that the removal of this action from state court fails as not all the defendants joined in the removal in a timely fashion.

For the reasons detailed herein, this court concludes that while the defendants' removal of this action was timely, no discovery on the issue of diversity is necessary. The objective facts establish that the assignments were not collusive, and that CPIM is the proper plaintiff. Therefore, this court recommends to the District Judge to whom this case is assigned that the motion to take discovery be DENIED.

## II.  STATEMENT OF FACTS RE VALIDITY OF THE ASSIGNMENTS

The following facts are undisputed unless otherwise indicated.

### Overview

CPIM is a Delaware corporation with a principal place of business in Concord, Massachusetts. Complaint ("Compl.") ¶ 11. It "was responsible for the sourcing, review, analysis, and purchase decisions for U.S. investments for its clients," including nine foreign hedge funds known as Caliber Global Investment Ltd., CAMBER 3 PLC,

CAMBER 4 PLC, CAMBER 5 Ltd., CAMBER 7 PLC, CPIM Structured Credit Fund 20 LP, CPIM Structured Credit Fund 500 LP, CPIM Structured Credit Fund 1000 LP, and CPIM Structured Credit Fund 1500 LP (collectively the "Clients" or the "hedge funds").[2] Id. ¶ 12.  CPIM obtained written assignments of their rights from its Clients, which will be discussed in detail infra.  On or about July 9, 2010, CPIM, "as the exclusive assignee of, and the exclusive attorney-in-fact for" the Clients, filed a multi-count complaint in the Massachusetts Suffolk Superior Court alleging violations of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, in connection with the sale of mortgage-backed securities.  The defendants are investment firms, underwriters and dealers who sold mortgage-backed securities (collectively, the "Wall Street Bank defendants") and the "Depositor defendants" who purchased or acquired mortgage loans, securitized them, and were the "issuers" of the securities sold by the Wall Street Bank defendants.  Id. ¶¶ 14, 31.  CPIM alleges that the Wall Street Banks and Depositor defendants worked together in selling the mortgage-backed securities.  Id. ¶ 6.

According to the Complaint, the defendants offered or sold approximately $2.4 billion worth of mortgage-backed securities to the hedge funds "by means of untrue

---

[2] While the defendants contend that they do not know the exact parameters of CPIM's involvement with the purchases at issue in this litigation, the defendants do not challenge this generalized description of CPIM's role.  Nor do they challenge CPIM's contention that it was the entity that dealt directly with the defendants in connection with the purchases at issue.  See Compl. ¶ 68.  As detailed below, more precise information about CPIM's involvement in the purchases at issue is not needed for the motions presently before the court.

statements of material facts and omissions of material fact" that resulted in losses

exceeding $1.2 billion.  Id. ¶ 1.  Thus, it is alleged generally that:

> Defendants' written and oral untrue statements concerned: (1) the
> mortgage originators' underwriting standards that were purportedly
> applied to evaluate the ability of the borrowers to repay the loans
> underlying the Securities; (2) the appraisal standards that were
> purportedly applied to evaluate the value and adequacy of the
> mortgaged properties as collateral; (3) the loan-to-value ("LTV")
> ratios, debt-to-income ratios, and purported occupancy status of the
> mortgaged properties, including whether the properties were "owner
> occupied," "second homes," or "investment properties"; (4) the Wall
> Street Bank Defendants' due diligence of the loans and the mortgage
> originators' underwriting practices; and (5) various forms of credit
> enhancement applicable to certain tranches of Securities.

Id. ¶ 1.  All communications regarding these potential purchases by the hedge funds were

directed by the defendants to CPIM.  Id. ¶ 68.  Thus, without limitation, the Wall Street

Bank defendants sent numerous documents to CPIM for consideration, and held a number

of meetings with CPIM.  Id. ¶¶ 68, 71.  There were no direct communications between

the defendants and the hedge funds.  See id. ¶ 14.  As a result, CPIM has direct

knowledge about the communications and actions referenced in the Complaint.  See, e.g.,

id. ¶ 8.

### The Assignments

During the period April 29, 2010 through July 6, 2010, the hedge funds assigned

their rights to CPIM by way of written assignments.  The parties dispute whether, as a

matter of law, these are partial or complete assignments.  The record before the court

contains the actual assignments, attached to the Declaration of David R. Stickney,

counsel for CPIM (Docket No. 184), and Notices to Shareholders issued by the hedge

funds, attached to the Affidavit of Matthew L. Craner, counsel for several Barclays

defendants (Docket No. 160).  As detailed herein, regardless how the parties characterize

the assignments, the undisputed facts establish that CPIM obtained the exclusive and

complete right to pursue any and all claims against the defendants relating in any way to

the purchase and sale of the securities at issue in this litigation.  If CPIM prevails,

however, the hedge funds will be entitled to a significant percentage of the recovery.

Each of the assignments provides in substance that the Client:

> hereby assigns, transfers, and sets over (the "Assignment") to CPIM
> all right, title, and interest of [client] in and to any and all demands,
> claims, accounts, actions, causes of action, and suits (in all instances,
> whether arising in contract, tort, or by virtue of any U.S. federal or
> state statutes), against the Dealers arising under, by reason of, or in
> any way relating to the Bonds (the "Claims"); ....

Declaration of David R. Stickney (Docket No. 184) ("Stickney Decl.") at Ex. 1 (Caliber

Global Investment Ltd.) ¶ 1.1; Ex. 2 (CAMBER 3) ¶ 1; Ex. 3 (CAMBER 4) ¶ 1; Ex. 4

(CAMBER 5) ¶ 1; Ex. 5 (CAMBER 7) ¶ 1-1.2; Ex. 6 (CPIM Structured Credit Fund 20

LP) ¶ 1; Ex. 7 (CPIM Structured Credit Fund 500 LP) ¶ 1; Ex. 8 (CPIM Structured Credit

Fund 1000 LP) ¶ 1; Ex. 9 (CPIM Structured Credit Fund 1500 LP) ¶ 1.  Each of the

Clients agreed in substance "to take any and all reasonable actions as requested by CPIM

to complete, effectuate, and perfect the assignment contemplated herein, so as to ensure

that any potential defendants to the assigned subject matter are not subjected to litigation

in more than one judicial action concerning the assigned subject matter" and, "in addition

to assigning its Claims to CPIM," each Client appointed "CPIM as its exclusive, true, and lawful attorney-in-fact" for purposes of, <u>inter</u> <u>alia</u>, pursuing the Claims. <u>Id.</u> at Exs. 1-3 & 5-9 ¶¶ 3-4; Ex. 4 ¶¶ 4-5. CPIM was granted the exclusive right to decide how to pursue the Claims, including having complete control over bringing and maintaining litigation and the exclusive right to settle, compromise or release any of the Claims. <u>Id.</u> at Exs. 1-3 & 5-9 ¶ 4; Ex. 4 ¶ 5.

Further, pursuant to the assignments, one Client, Caliber was to pay CPIM up to $500,000 to reimburse it for its litigation "expenses." <u>Id.</u> at Ex. 1 ¶ 1.2. However, in the event of a recovery, CPIM would then reimburse Caliber for any expense payments made. <u>Id.</u> at ¶ 2.4.3. All of the other assignments provided that CPIM was liable for all litigation expenses for which it would be repaid out of any recovery. <u>See</u>, <u>e.g.</u>, <u>id.</u> at Ex. 2 ¶ 2.5; Ex. 3 ¶ 2.2.3; Ex. 5 ¶ 2.2.3; Ex. 7 ¶ 5.

Each of the assignments acknowledges that CPIM was the entity "responsible for the sourcing, review and due diligence of U.S. investments" for the Client, and that CPIM was the entity that had been solicited by the "Dealers" who offered the securities for sale. <u>Id.</u> at Exs. 1-9 at Recitals. Some of the assignments also expressly acknowledge that "[i]n view of CPIM's superior knowledge base and infrastructure, CPIM would be best positioned to pursue these claims in an efficient and appropriate manner." <u>E.g.</u>, <u>id.</u> at Ex. 2, Recital (E). Finally, each of the assignments provides that "[i]n consideration of

the Assignment" CPIM would pay the Client amounts ranging generally from 50% up to 70% of any net recovery.[3]  See, e.g., id. at Exs. 3 & 5 ¶ 2.1; Exs. 6, 8 & 9 ¶¶ 2.1-2.1.1.

## Notices to Shareholders

The defendants rely on the Notices to Shareholders which were published by the hedge funds in support of their claim that the assignments were not complete assignments.  As detailed herein, while the Notices use different language, they mirror the assignments on the critical points.[4]

Specifically, the Notices confirm that all rights to assert claims relating to the mortgage-backed securities were assigned to CPIM, and that the hedge funds were to be paid a portion of any recovery.  Thus, Camber 3's Notice of July 2, 2010 informs Noteholders that Camber 3 (as "Issuer") "has transferred and assigned" its interest in "Claims," which are defined as "causes of action arising from the manner in which certain dealers and/or sellers are alleged to have offered and/or sold certain Collateral Assets to or for the account of the Issuer[,]" to an Assignee, and further explains that the "Claims will be prosecuted by or on behalf of the Assignee in the State of Massachu-

---

[3]  In the case of CPIM Structured Credit Fund 500 LP, the payment was to be $10,00 plus 10-25% of recovery depending on the amount of recovery.  Stickney Decl. at Ex. 7 ¶ 2.

[4]  This court disagrees with the defendants' contention that there is a "glaring difference between how CPIM and those foreign hedge funds characterize the assignments."  See Defendants' Reply in Support of Their Joint Motion for Leave to Take Jurisdictional Discovery (Docket No. 189) ("Defs.' Reply Mem.") at 9.  All agree that CPIM will be paid only if there is a recovery (i.e., its compensation is "contingent"), that the hedge funds will receive compensation only after litigation expenses and CPIM are paid, and that with the exception of $500,000 in litigation expenses discussed above, CPIM is fronting litigation expenses.  They further agree that CPIM has total control over the litigation.

setts." <u>Affidavit of Matthew L. Craner</u> (Docket No. 160) ("<u>Craner Aff.</u>") at Ex. A.  It further provides that "[a]s consideration for the Assignment, the Issuer will be entitled to receive an amount calculated by reference to any recoveries received on judgment or settlement of the Claims." <u>Id.</u>  In an updated Notice dated July 12, 2010, Camber 3 notified its Noteholders that it had assigned its Claims to CPIM "and will join with multiple clients of the CPIM Group who have assigned similar securities mis-selling claims." <u>Craner Aff.</u> at Ex. B.  Camber further advised that CPIM "will pursue the Claims but Camber 3 has no liability for any fees, costs or expenses of the litigation and will receive all recoveries after the expenses and contingency fees of [trial counsel] and CPIM." <u>Id.</u>  Similar notices and updates were issued by Camber 4 and Camber 7 as well. <u>Craner Aff.</u> at Exs. C-F.  Thus, the dispute in this case is not whether the hedge funds will receive a percentage of any recovery, but, rather, what the ramifications are of such an arrangement vis-à-vis CPIM's status as the plaintiff in this litigation.

Additional facts will be provided below where appropriate.

### III.   DISCUSSION RE VALIDITY OF THE ASSIGNMENTS

#### A.   Standard of Review

The burden is on the party seeking to remove a case to federal court to establish federal jurisdiction. <u>Montana v. Abbot Labs.</u>, 266 F. Supp. 2d 250, 254 (D. Mass. 2003). "Furthermore, the removal statute should be strictly construed, and any doubts about the propriety of removal should be resolved against the removal of an action." <u>Id.</u> (citing <u>Danca v. Private Health Care Sys., Inc.</u>, 185 F.3d 1, 4 (1st Cir. 1999)).  In this case, the

defendants contend that CPIM has procured the assignments from the hedge funds for the purpose of defeating diversity jurisdiction.  While the prohibition against wrongfully attempting to defeat diversity jurisdiction is not as well-established as the prohibition against fabricating federal jurisdiction,[5] it is now generally established that the federal court must examine and disregard an assignment "'if it be found to have been made principally to defeat removal.'"  JMTR Enters., L.L.C. v. Duchin, 42 F. Supp. 2d 87, 92 (D. Mass. 1999) (quoting Grassi v. Ciba-Geigy, Ltd., 894 F.2d 181, 185 (5th Cir. 1990)).[6] However, and perhaps "[n]ot surprisingly, without guidance from statute or the Supreme Court, there is hardly a consistent body of law addressing attempts to *defeat* diversity jurisdiction."  HDNet MMA 2008 LLC v. Zuffa, LLC, Civil Action No. 3:08-CV-0442-G, 2008 WL 958067, at *4 (N.D. Tex. Apr. 9, 2008).

In the instant case, while the parties generally agree on the appropriate standard to be applied in evaluating the assignments to CPIM, they disagree on the outcome of such an evaluation.  Each of the parties cites to a number of cases in support of its position.

_____

[5]   28 U.S.C. § 1359 provides that a district court does not have jurisdiction in a civil case where "any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."  "There is no parallel statutory authority regarding assignments made to defeat the jurisdiction of a district court" and, as a result, "'[t]here are substantially more cases dealing with a plaintiff's attempt to manufacture diversity than to destroy it.'"  JMTR Enters., L.L.C. v. Duchin, 42 F. Supp. 2d 87, 92 (D. Mass. 1999) (quoting Boyer v. Snap-On Tools Corp., 913 F.2d 108, 110 (3d Cir. 1990)) (additional citation omitted).

[6]   In HDNet MMA 2008 LLC v. Zuffa, LLC, Civil Action No. 3:08-CV-0442-G, 2008 WL 958067 (N.D. Tex. Apr. 9, 2008), the District Court described the practice of federal courts "to examine the underlying nature of transactions that have the effect of manipulating diversity jurisdiction" to defeat federal jurisdiction as a "recent" trend.  2008 WL 958067, at *4.

However, none of them presents the situation here, where, among other things, the defendants communicated solely with the assignee, not the assignors, the assignee played a critical role in the challenged transactions, and the assignee will, undoubtedly, be a key witness in the litigation regardless whether it is a named plaintiff or not. As detailed below, given the integral role that CPIM played in the challenged transactions, this court finds that there can be no basis for a conclusion that the assignments were "made principally to defeat removal."

> Whether the assignment here was improperly or collusively made "is to be resolved as a simple question of fact." *Grassi*, 894 F.2d at 186. There is a "pattern" of facts that courts have found indicative of a plaintiff's impermissible attempt to destroy diversity through assignment. *See Attorneys Trust v. Videotape Computer Prods., Inc.*, 93 F.3d 593, 599 (9th Cir. 1996); *Grassi*, 894 F.2d at 186; *Picquet v. Amoco Prod. Co.*, 513 F. Supp. 938, 943 (M.D. La. 1981). The pattern includes, among other factors: (1) a partial, rather than total, assignment; (2) lack of consideration paid by the assignee to the assignor; (3) the plaintiff's motive was to stay in state court; (4) the assignee had no interest in the litigation before the assignment; and (5) the assignment was made shortly before the suit was filed. *See Grassi*, 894 F.2d at 186.

JMTR Enters., 42 F. Supp. 2d at 92 (citations added). Put another way, among the "factors which are to be considered in deciding whether an assignment is improper or collusive" are:

> were there good business reasons for the assignment; did the assignee have a prior interest in the item or was the assignment timed to coincide with commencement of litigation; was any consideration given by the assignee; was the assignment partial or complete; and was there an admission that the motive was to create jurisdiction.

<u>Attorneys Trust</u>, 93 F.3d at 595-96.  An examination of all of these factors together compels the conclusion that the assignment to CPIM was not collusive.

### B.   <u>The Assignment Was Not Improper</u>

#### 1.   <u>Partial vs. Complete Assignment</u>

In the instant case, the parties spend a great deal of time arguing whether the assignments were complete or partial assignments.  That is because "[b]roadly speaking, if an assignment is entire, not partial, there is a very good chance that it will be found to be proper."  <u>Id.</u> at 596.  Some courts have gone so far as to assert that "if the assignment is truly absolute and complete, motive often recedes into almost nothing."  <u>Id.</u> and cases cited therein.  Thus, they have refused to inquire any further into any aspect of a complete assignment.  <u>See</u> <u>Amalgamated Gadget, L.P. v. MAck</u>, No. Civ. A. 3:03-CV-0952, 2004 WL 549483, at *4 (N.D. Tex. Feb. 10, 2004) ("Once it is determined that the assignment was a complete assignment, the Court's inquiry ends, and the Court does not examine whether the assignment was improperly or collusively made." (quotations and citation omitted)), and cases cited therein.  On the other hand, other courts have not been as absolute and have recognized that "even when there is a complete assignment, collusion may be found[,]" although it is rare.  <u>See</u> <u>Attorneys Trust</u>, 93 F.3d at 596, and cases cited therein.

Courts are much more likely to find that there is "an improper or collusive trans-fer" in the case of partial assignments.  <u>Id.</u> at 597.  That is "because the prior owner still has an interest" in the property.  <u>Id.</u>  Nevertheless, that rule is not absolute, and partial

assignments may also withstand scrutiny.  See id.  However characterized, "the main

focus is usually upon the reality of the transaction itself.  Does the assignee have

something to lose because he had preexisting rights; or has the assignee paid for the

assignment; or has he acquired only a relatively small part of the underlying interest, a

part that could be expected to relate to expenses of collection alone; or, finally, is the

assignment merely one for collection?  In fine, is the assignee truly a real party in interest

or just a strawman for all practical purposes?  If the latter, an assignment which creates

jurisdiction will be dubbed improper."  Id.  In sum, the court will "disregard the

assignment in determining jurisdiction if it be found to have been made principally to

defeat removal."  Grassi, 894 F.2d at 185 (cited in JMTR Enters., 42 F. Supp. 2d at 92).

    In the instant case, this court concludes that the assignments to CPIM were not

improperly designed to defeat diversity, regardless whether considered to be complete or

partial assignments.  Nevertheless, in view of the extensive briefing, this court will

address the issue.  As detailed herein, this court concludes that the assignments to CPIM

were "complete" assignments for purposes of evaluating diversity jurisdiction.

    The language of the assignments makes it clear that CPIM has the sole and exclu-

sive right to pursue the claims against the defendants and has the discretion to pursue

litigation, settle the claims, or take any other actions to resolve the disputes with the

defendants.[7]  The hedge funds do not retain any right to control the litigation or the

---

[7]  The assignments do cover the situation where the assignor "is required by CPIM or any
court to be added or substituted as a real party in interest" and requires the assignor to "do all

settlement thereof, nor can they seek to enforce their claims against the defendants in any

forum.  There is nothing in the language of the assignments which indicates in any way

that the assignment is being given only as security for any obligation, or that the hedge

funds retain any right to bring a claim on their own behalf.[8]  See Larabee v. Potvin

Lumber Co., Inc., 390 Mass. 636, 641, 459 N.E.2d 93, 96-97 (1983) (unambiguous words

in an assignment "must be construed in their usual and ordinary sense" and do not

"suggest the sellers meant to reserve any rights for themselves" (quotations and citation

omitted)).  Rather, in the instant case, the hedge funds would not have standing to

maintain any claims against the defendants because they have assigned all of their claims

to CPIM.  See Genesco, Inc. v. Koufman, 11 Mass. App. Ct. 986, 989, 418 N.E.2d 625,

628 (1981) (where plaintiff assigned "all of its . . . right, title, and interest in all claims

which it has[,]" it no longer owns the claims (internal quotations omitted)); O'Connor

---

things necessary to effectuate such addition or substitution or take such further actions as
required[.]"  E.g., Stickney Decl. at Ex. 2 ¶ 3.  Tellingly, the assignments go on to provide that
the assignor "shall in all other respects comply with this Agreement regarding the conduct and
management of litigation."  Id.  Thus, it is clear that the addition of the assignor as a party would
only arise if required by the court or as a matter of law, and that, even so, the parties intended for
CPIM to remain in control of the litigation.

   [8]  Therefore, the cases on which the defendants rely, in which it was determined that an
assignment granted only a security interest, and the original owner retained the right to prosecute
a claim, have no application to the instant situation.  See, e.g., In re Navigation Tech. Corp., 880
F.2d 1491, 1493-94 (1st Cir. 1989) (where "wording of the assignment [of royalties by a debtor]
clearly supports the determination that it served as security for money loaned," the debtor retained
an ownership interest in the royalties and trustee in bankruptcy could seek to collect royalties on
behalf of the debtor estate); MHI Shipbuilding, LLC v. Nat'l Fire Ins. Co. of Hartford, 286 B.R.
16, 29-31 (D. Mass. 2002) (language and context shows that assignment intended only to provide
collateral security for a loan guarantee and was not a total assignment: therefore assignor
maintained right to sue).

Café of Worcester, Inc. v. Liquor Liab. Joint Underwriting Ass'n of Mass., No. WOCV 991090A, 1999 WL 792199, at *2-3 (Mass. Super. Sept. 13, 1999) (real party in interest was assignee of "all of [the assignor's] rights, title and interest in any and every claim" that the assignor may have had against the defendant (emphasis omitted)).  Under such circumstances, the assignments should be deemed to be "complete."

The defendants rely on cases which state that where a plaintiff shares its recovery, an assignment is not complete.  See, e.g., Amalgamated Gadget, 2004 WL 549483, at *4. However, in those cases, the assignment was generally only of a small percentage of the recovery and "involved obviously collusive partial assignments, which were motivated by a desire to defeat diversity jurisdiction."  Attorneys Trust, 93 F.3d at 598 (citing Grassi, 894 F.2d at 182, in which plaintiffs transferred 2% of claim; Carter v. Seaboard Coast Line R.R. Co., 318 F. Supp. 368, 369-70, 372 (D.S.C. 1970), involving assignment of 1/100 of a minor's cause of action; and Gentle v. Lamb-Weston, Inc., 302 F. Supp. 161, 162, 166 (D. Me. 1969), in which court held that 1/100 assignment was made for purpose of destroying diversity jurisdiction).  See also Smilgin v. N.Y. Life Ins. Co., 854 F. Supp. 464, 466 (S.D. Tex. 1994) (involving assignment of 1% of claim); JMTR Enters., 42 F. Supp. 2d at 92 (involving assignment of 25% of claim to entity created specifically for purpose of defeating diversity jurisdiction); Attorneys Trust, 93 F.3d at 599 (assignment expressly for purposes of collection and assignee "was simply to get a 12% contingent fee for its trouble"); Minogue v. Modell, No. 1:06CV286, 2006 WL 1704932, at *16 (N.D. Ohio June 16, 2006) ("In most of the partial assignment cases, [the] retained interest was

95% or greater."), and cases cited therein.  Even more importantly, "they were also cases where the assignee was not truly a real party in interest.  Rather, the assignee was a strawman and had no real interest in the outcome of the case, although a good outcome would have had some economic value."  Attorneys Trust, 93 F.3d at 598.  The same cannot be said for CPIM, which recommended the challenged transactions to its Clients based on information it contends was fraudulent.  CPIM's retention of 50% or so of any recovery is not a *de minimus* interest, and was facially not designed simply to compensate CPIM as an agent for collection.

The present case is similar, although not identical, to Bullard v. City of Cisco, Texas, 290 U.S. 179, 54 S. Ct. 177, 78 L. Ed. 254 (1933).  There, the original owners and holders of bonds and coupons on which payment had not been made assigned them to a bondholders committee "for the purpose of conserving, salvaging, and adjusting the investment[,]" and for taking all necessary steps "to effect a helpful adjustment of the situation" through any means it found appropriate, "including litigation if needed."  Id. at 189-90, 54 S. Ct. at 181.  The Court rejected the defendants' contention "that the plain-tiffs were not actual or beneficial owners of the bonds and coupons sued on but held them solely for purposes of collection on behalf of others who severally were the real owners, and none of whom could sue in federal court because their respective holdings were not in excess of $3,000."  Id. at 180-81, 54 S. Ct. at 177.  Rather, the Court held, the assign-ments to the committee "were real and intended to invest the plaintiffs with the full title, even though in trust for purposes of which the transferrers ultimately would be the chief

beneficiaries[.]"  <u>Id.</u> at 188, 54 S. Ct. at 180.  A similar conclusion was reached in <u>Sprint</u>

<u>Comm. Co. v. APCC Serv., Inc.</u>, 554 U.S. 269, 285-88, 123 S. Ct. 2531, 2542-43 (2008),

where the Court held that the assignment of "all rights, title and interest" in a claim gave

the assignee Article III standing to bring suit, even though all proceeds of the litigation

were to be remitted to the assignor.  Similarly, in the instant case CPIM obtained full

control over the claims: the fact that the hedge funds were to benefit from any recovery

does not render the assignments any less complete.  <u>See</u> <u>also</u> <u>Navarro Sav. Ass'n v. Lee</u>,

446 U.S. 458, 464, 100 S. Ct. 1779, 1783-84, 64 L. Ed. 2d 425 (1980) (trustees with

"customary powers to hold, manage, and dispose of assets for the benefit of others" are

the real parties in interest).

Finally, the assignments were clearly designed to make CPIM the "real party in

interest."  "[T]he purpose of the real party in interest rule is to protect defendants from

subsequent similar suits by one not a party to the initial suit."  <u>MHI Shipbuilding, LLC v.</u>

<u>Nat'l Fire Ins. Co. of Hartford</u>, 286 B.R. 16, 31 (D. Mass. 2002).  In most cases where

there is a "partial" assignment, there is a transfer of a fractional interest "making both the

transferor and transferee real parties in interest."  <u>Grassi</u>, 894 F.2d at 185.  Thus, "the

assignor who makes a fractional assignment remains a party to the action[.]"  <u>Id.</u>  That

clearly is not the case here.  CPIM is the only party that can maintain this action and its

Clients have given up all rights to challenge the defendants in other litigation.  For all

these reasons, this court finds that the assignment was a "complete" assignment for

purposes of determining whether CPIM is the real party in interest.

## 2.      The Assignments Were Not Designed To Defeat Diversity

Even if this court were to find that the assignments were only partial assignments,

however, an evaluation of all the other factors courts consider compels the conclusion

that the principal reason for the assignments could not be to defeat diversity.  CPIM's

involvement in the transactions at issue predate the litigation.  CPIM was not formed for

the purpose of the litigation, nor is its business solely to prosecute the claims.  Rather, it

is an ongoing, viable entity.  Compare JMTR Enters., 42 F. Supp. 2d at 92-93.  The

defendants themselves were amenable to dealing exclusively with CPIM in connection

with the sales at issue in this litigation.  The defendants did not communicate directly

with the hedge funds, but were satisfied to address their marketing materials and sales

pitches to CPIM.  The undisputed facts support the recital in the assignments that "[i]n

view of CPIM's superior knowledge base and infrastructure, CPIM would be best

positioned to pursue these claims in an efficient and appropriate manner."  Stickney Decl.

at Ex. 2, Recital E.  Thus, of critical importance in the instant case, there were "good

business reasons for the assignment."  Attorneys Trust, 93 F.3d at 595.

CPIM is also giving consideration for the assignment.  Not only will CPIM pay a

percentage of the recovery to the hedge funds, but it is also funding the litigation and has

the risk of the legal fees and expenses.  While Caliber may have to front a considerable

amount of such "expenses," there is no assurance in this complex and highly contested

litigation that these expenses will be less than $500,000.00.  Even more significant,

however, neither Caliber nor any other assignor is liable for legal fees; those are to be

borne solely by CPIM. Thus, in addition to a percentage of any recovery, CPIM is giving consideration in the form of paying the legal fees for the assignments.

A review of the objective facts negates a conclusion that CPIM was selected because of its status as a Delaware corporation and for the purpose of defeating diversity jurisdiction. CPIM may not have had a legal interest in the litigation prior to the assignments, but, as the entity "responsible for the sourcing, review and due diligence" of domestic investments for its clients, it clearly had an interest in the transactions. "At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness" exists in order to "sharpen[] the presentation of issues upon which the court so largely depends for illumination." Massachusetts v. E.P.A., 549 U.S. 497, 517, 127 S. Ct. 1438, 1453, 167 L. Ed. 2d 248 (2007) (quotations and citation omitted). CPIM has such a personal stake. It is not a "front" which stepped into an unrelated transaction.

Finally, the defendants rely on the timing of the assignments to support their argument that the assignments were collusive. In this case, however, timing proves nothing. The fact that the assignments took place shortly before the litigation was commenced does not call in to question the fact that CPIM was being designated as the entity to pursue the claims because it had engaged in the challenged transactions with the defendants.

### 3.    There Is No Need For Discovery

There is no discovery being requested which can negate the fact that CPIM has been involved in these transactions since the assets were first sold to the hedge funds. This is not a situation "where the assignee entity could not demonstrate a legitimate raison d'etre other than for the destruction of diversity." HDNet MMA 2008 LLC, 2008 WL 958067, at *5 (italics omitted). Even assuming, arguendo, that defeating federal jurisdiction played some role in the assignment, there can be no question that "the plaintiff was also influenced by other factors unrelated to jurisdiction." Id. (quotations and citation omitted). Therefore, CPIM is the real party in interest pursuant to the assignments.

Discovery is also not warranted because, even assuming the parties' subjective motive in connection with the assignments is relevant, it is, "at most, of secondary importance to objective factors." Reinhart Oil & Gas, Inc. v. Excel Directional Techs., LLC, 463 F. Supp. 2d 1240, 1246 (D. Colo. 2006). "For instance, when an assignor retains no interest in or control over the litigation and when meaningful consideration is given for the assignment, these objective factors suggest the assignment was 'real' and not a sham transaction." Id. at 1247-48. "Also, when an assignee has a substantial pecuniary interest in the outcome of the litigation and funds the litigation, it is likely that the assignee is a real and substantial party to the controversy." Id. at 1248. In light of these undisputed, objective facts, there is no need for discovery on the issue of diversity, and the assignments have rendered CPIM the real party in interest.

C.    **Misjoinder**

-19-

The defendants urge this court to assess whether there is diversity vis-à-vis each of the defendants separately.  See Defs' Mem. (Docket No. 159) at 9-10.  "'In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the *entire* action.'"  Palmer v. Davol, Inc., Nos. 07-md-1842-ML, 08-cv-02499-ML, 2008 WL 5377991, at *1 (D.R.I. Dec. 23, 2008) (quoting Picciotta v. Cont'l Cas. Co., 512 F.3d 9, 21 (1st Cir. 2008)).  Thus, the defendants argue that the court should apply the doctrine of "procedural misjoinder" and delve into whether there was a "purposeful attempt to defeat removal" by joining unrelated claims against multiple defendants.  See id. at *2 (internal quotations and citation omitted).

As an initial matter, "[t]he First Circuit has not adopted or addressed the doctrine of procedural misjoinder" and it is a very "unsettled" area of the law.  Id. at *3.  More importantly, if CPIM is the proper plaintiff as this court has found, the defendants indicated at oral argument that there is only one defendant who may be diverse.  If the only basis for this court's jurisdiction is diversity,[9] then the one defendant may file a motion to sever and the issue can be decided on a more complete record.

## IV.  DISCUSSION RE SUFFICIENCY OF CONSENT TO REMOVAL

CPIM also contends that this court lacks diversity jurisdiction because not all of the defendants consented to the removal of this action in a timely manner.  While the

---

[9]  The defendants have asserted bankruptcy related jurisdiction as well.  That issue is addressed in this court's Report and Recommendation on Plaintiff's Motion to Remand.

issue is not free from doubt, this court recommends that removal of this action from the state court be found to have been undertaken in a timely manner.

The removal statute, 28 U.S.C. § 1446, sets out the procedures for removing a case filed in state court to federal court.  Pursuant to 28 U.S.C. § 1446(b), a defendant must file its notice of removal

> within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based....

(Emphasis added).  Where, as here, there are multiple defendants, "all defendants who have been served must join or assent in the removal petition" pursuant to what is known as the "rule of unanimity."  In re Pharm. Indus. Average Wholesale Price Litig., 307 F. Supp. 2d 190, 193 (D. Mass. 2004), and cases cited.  The issue is when each of the defendants must file its consent and what is the effect of a defendant failing to file within 30 days of that defendant having been served.  The statutory period "is not jurisdictional."  Renaissance Mktg., Inc. v. Monitronics Int'l, Inc., 606 F. Supp. 2d 201, 204 (D.P.R. 2009), and cases cited.  "Notwithstanding, since federal courts are courts of limited jurisdiction, removal statutes are strictly construed, and must be strictly complied with."  Id. and cases cited.  "Moreover, the party requesting removal bears the burden of showing that removal is proper."  Id. at 205, and cases cited.

In the instant case, several defendants are defunct and/or have not yet been served.  These defendants are not considered in connection with the timeliness of removal.  See 14C Charles Alan Wright, et al., Federal Practice & Procedure Jurisdiction § 3730 at 462

(4th ed. 2009) ("Thus, as many cases have held, defendants who have not been properly served may be ignored, not only for jurisdictional purposes . . . but also for purpose of requiring their joinder in the notice of removal."); <u>Michigan Dep't of Transp. v. Allstate Painting & Contracting Co.</u>, No. 2:08-CV-286, 2009 WL 891702, at *1 (W.D. Mich. Mar. 31, 2009) (inactive, defunct corporation does not need to consent to removal).  All the defendants who have been served have consented to the removal to federal court within 30 days of the date the last defendant was served.  However, not all have consented within 30 days from the date the particular defendant was served.  This court concludes that the consents were sufficient to effectuate removal.

> Two divergent views have arisen with respect to the 30-day window for removal as applied to multi-defendant cases.  Under the traditional, "first-served defendant" approach, as soon as one defendant is served, all defendants have 30 days either to remove the case or to consent to removal, regardless of when the remaining defendants are served.  *See Gorman v. Abbott Labs.*, 629 F. Supp. 1196, 1201 (D.R.I. 1986).  That approach can produce the harsh result of entirely foreclosing the option of removal from all defendants when the first-served defendant sleeps on his or her right to remove for 30 days.

> Consequently, the "fairness," or "last-served defendant," approach has emerged to ensure that all qualified defendants have the opportunity to try to remove a case to federal court.  Under that approach, removal may be effectuated when notice of removal is filed with the consent of all defendants within 30 days of service of process on the last served defendant.  *See Garside by Garside v. Osco Drug, Inc.*, 702 F. Supp. 19, 22 (D. Mass. 1988).  The First Circuit Court of Appeals has not yet endorsed either approach.

<u>Abdullah v. Am. Prods. Co., Inc.</u>, 661 F. Supp. 2d 84, 85 (D. Mass. 2009).  This court believes that the application of the last-served defendant rule is "most appropriate" and

"in accord with fairness."  BCCTC Assocs., Inc. v. Summerdale/AAHFI, L.P., 656 F.

Supp. 2d 208, 214 (D. Mass.  2009).

Application of the last-served defendant rule is consistent with the well-established

principle that "compliance with the thirty day rule is not a jurisdictional prerequisite" and

can be "waived by the parties if they fail to make a timely motion to remand.  Conse-

quently, this court is not divested of subject matter jurisdiction solely by virtue of a late

removal."  Garside by Garside v. Osco Drug, Inc., 702 F. Supp. 19, 21 (D. Mass. 1988).[10]

See also Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 75 (1st Cir. 2009) (a "defect

in the removal process resulting from a failure of unanimity is not considered to be a

jurisdictional defect" and may be waived if a party fails to move to remand based on this

defect).  Moreover, the First Circuit has recognized that any defect in the unanimity

requirement may be cured, and has expressly declined "to establish a wooden rule,

regardless of whether such a rule would have the benefit of promoting clarity."  Id. at 77

(allowing a defect to be cured when defendant opposed a motion to remand "thereby

clearly communicating its desire to be in federal court").  Here, all the defendants have

made it clear that they have consented to the removal, and have done so within 30 days of

service on the last defendant.  Accepting the last-served defendant rule is consistent with

allowing flexibility in the removal process and recognizes every defendant's right to seek

---

[10]  This court recognizes that there are older cases in this jurisdiction to the contrary.  See
discussion in Murphy v. Newell Operating Co., 245 F. Supp. 2d 316, 318-19 (D. Mass. 2003).

a federal forum if jurisdiction exists.  Therefore, this court does not recommend that the

consents to removal be found to be untimely.

## V.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that the defendants' joint motion to take jurisdictional

discovery (Docket No. 158) be DENIED.[11]


                                               / s / Judith Gail Dein
                                              Judith Gail Dein
                                              U.S. Magistrate Judge

---

[11]   The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party
who objects to these proposed findings and recommendations must file a written objection thereto
with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommenda-
tion.  The written objections must specifically identify the portion of the proposed findings,
recommendations or report to which objection is made and the basis for such objections.  The
parties are further advised that the United States Court of Appeals for this Circuit has repeatedly
indicated that failure to comply with this Rule shall preclude further appellate review.  See
Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v.
Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616
F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982);
Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-
54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp.,
199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir.
1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).